# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H.R. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 21-cv-01856-TJK-RMM |

## REPORT & RECOMMENDATION

This case was brought by H.R., a child with disabilities, and his parents (collectively "Parents"), who allege that Defendant District of Columbia ("the District") has deprived H.R. of the free appropriate public education ("FAPE") to which he is entitled under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"). Parents ask this Court to find that two Hearing Officers erred when they concluded that the Individualized Education Programs ("IEPs") developed for H.R. for the 2020–21 and 2021–22 school years did not constitute a denial of a FAPE or another violation of the IDEA, and that the Hearing Officers erred when they concluded that the due process complaints before them were not mooted by the development of subsequent IEPs. District Judge Timothy J. Kelly referred the matter to the undersigned for full case management. *See* July 13, 2021 Min. Order; July 13, 2021 Referral Entry.

Pending now are the parties' cross-motions for summary judgment. After reviewing the cross-motions, the undersigned ordered supplemental briefing regarding the status of H.R.'s IEP and educational placement for the 2023–24 school year and the parties' positions on whether this case is moot due to the development of subsequent IEPs. *See* Sept. 25, 2023 Min. Order.

Having reviewed the administrative record,[1] the parties' briefs,[2] and the relevant law, the undersigned recommends that this Court DENY Parents' motion and GRANT the District's cross-motion as explained below.

## BACKGROUND

### I.   Statutory Framework

Congress enacted the IDEA to ensure that children with disabilities receive a free appropriate public education ("FAPE") that tailors a child's education and related services to her unique needs, and to ensure that the rights of such children and their parents are protected.  *See* 20 U.S.C. § 1400(d)(1)(A); *B.D. v. District of Columbia*, 817 F.3d 792, 794 (D.C. Cir. 2016). Under the IDEA, children with disabilities who reside in the school district must be "identified, located, and evaluated."  20 U.S.C. § 1412(a)(3)(A).  Once a child with disabilities is identified, the child's parents, teachers, school officials, and other professionals work together annually to develop an IEP to meet the child's needs for the coming school year.  *Id.* §§ 1412(a)(4), 1414(d)(1)(B).

---

[1] The administrative record for IDEA matter 2020-0151, *see* ECF Nos. 16–17, will be referred to as "AR1," and the administrative record for IDEA matter 2021-0200, *see* ECF Nos. 18–20, will be referred to as "AR2."  Citations to the administrative record refer to the running pagination at the lower left (AR1) or lower middle (AR2) margin.

[2] The relevant briefs are: Pls.' Mem. in Supp. of Mot. Summ. J. ("Pl. Mem."), ECF No. 21; Def.'s Opp'n to Pls.' Mot. Summ. J. and Mem. in Supp. of Cross Mot. Summ. J. ("Def. Mem."), ECF No. 26 (also filed at ECF No. 27); Pls.' Reply to Def.'s Opp'n and Opp'n to Def.'s Cross Mot. Summ. J. ("Pl. Reply"), ECF No. 28 (also filed at ECF No. 29); Def.'s Reply to Pls.' Opp'n ("Def. Reply"), ECF No. 30; Pls.' Supplemental Mem. ("Pl. Supp."), ECF No. 31; and Def.'s Supplemental Mem. ("Def. Supp."), ECF No. 32.  Throughout this Report and Recommendation, page citations to documents in the record other than the AR refer to the document's original pagination, unless the page is designated with an asterisk (*e.g.*, *1), in which case the reference is to the pagination assigned by PACER/ECF.

A "local education" or "State" agency—in this case, District of Columbia Public Schools ("DCPS")—performs an "initial evaluation" to determine if a child has a qualifying disability. *Id.* § 1414(a)(1). In conducting the evaluation, DCPS must use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," and the child must be evaluated "in all areas of suspected disability." *Id.* § 1414(b). DCPS may not use "any single measure or assessment as the sole criterion for determining whether a child is a child with a disability." *Id.* "This initial evaluation, and any subsequent re-evaluation, forms the basis for identifying the child's needs and the requirements of the child's IEP to meet those needs and support her educational development." *Herrion v. District of Columbia*, No. 18-cv-02827, 2019 WL 5086554, at *1 (D.D.C. Oct. 10, 2019).

If a parent disagrees with or is dissatisfied with the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," the IDEA authorizes them to present their arguments in an "impartial due process hearing." 20 U.S.C. §§ 1415(b)(6), 1415(f). At that hearing, the parties present evidence and expert testimony about the child's educational and functional needs to an independent hearing officer. *Id.* §§ 1415(f), 1415(h). The independent hearing officer then issues a Hearing Officer Determination ("HOD"), which examines whether DCPS denied the student a FAPE and, if so, orders an appropriate remedy. *Id.* § 1415(f)(3)(E); *see also B.D.*, 817 F.3d at 798. Any party aggrieved by the findings and decisions made by the hearing officer may bring a civil action in state or federal court. *See* 20 U.S.C. § 1415(i)(2).

The IDEA provides that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j).

This "stay-put" provision is among the IDEA's "various procedural safeguards" that "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12 (1988). The provision reflects Congress's intent "to strip schools of the unilateral authority they had traditionally employed to exclude disabled students" pending completion of proceedings. *Id*. at 323. Thus, the stay-put provision "creates a powerful statutory presumption in favor of maintaining the current classroom placement of a student with a disability when the school seeks to change his placement over a parent's objections," such that "[t]he local educational agency must overcome a heavy evidentiary burden to displace the default rule that the child will stay put." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 522 (D.C. Cir. 2019).

## II.    Factual and Procedural Background

The parties' dispute centers on H.R., a child with disabilities who became eligible for special education and related services under the IDEA as a student with multiple disabilities, a "Specific Learning Disability" and an "Other Health Impairment."[3] *See* AR1 9. H.R. attended the Capitol Hill Day School ("CHDS"), a private school in Washington, D.C., for pre-K, kindergarten, and first grade. *See* AR2 1470–71. H.R. repeated kindergarten due to concerns that he was not emotionally or academically prepared to advance to first grade. *See* AR1 292. During H.R.'s first grade year, in December 2017 and January 2018, Dr. Julie Newman ("Dr. Newman") conducted a comprehensive neuropsychological evaluation of H.R. and diagnosed

---

[3] As of May 10, 2021, H.R. is no longer classified as a student with multiple disabilities; his only listed disability on his 2022–23 and 2023–24 IEPs, which are not before this Court, is "Other Health Impairment / Attention Deficit Disorder or Attention Deficit Hyperactivity Disorder." *See* AR2 503 (2021 Final Eligibility Determination Report); *see also* AR2 1051 (March 2022 IEP).

4

him with Attention Deficit Hyperactivity Disorder ("ADHD"), Specific Learning Disability with impairment in reading, and Developmental Coordination Disorder. *See* AR1 291–303. She recommended that he "would be best served by a private school with particular expertise in educating children with learning differences, such as the Lab School or a similar program." AR1 296. She also found that he "requires [a] research-based reading intervention delivered in a small group and/or individual setting." AR1 296.

DCPS evaluated H.R., determined that he was eligible for special education services, and developed an IEP for him for the 2018–19 school year (the "July 2018 IEP"). *See* AR1 317–34. The IEP contained mathematics, reading, written expression, and motor skills/physical development as areas of concern. *See* AR1 320–26. The IEP called for ten hours per week of specialized instruction outside general education, five hours per week of specialized instruction within general education, 240 minutes per month of occupational therapy, 30 minutes per month of occupational therapy consultation services, and additional supports at H.R.'s DCPS neighborhood school, Murch Elementary School ("Murch"). *See* AR1 14, 317, 329. Parents, believing that Murch could not provide the necessary services for H.R., unilaterally enrolled H.R. at the Lab School of Washington ("Lab"), a private special education day school in Washington, D.C., for the 2018–19 school year and filed a due process complaint challenging the July 2018 IEP. *See* AR1 381. Hearing Officer Peter Vaden ("Hearing Officer Vaden") issued a Hearing Officer's Determination ("HOD") finding that DCPS denied H.R. a FAPE because the July 2018 IEP did not contain a specific teaching methodology to address H.R.'s severe dyslexia and need for intense reading intervention, and ordered that DCPS reimburse the costs Parents incurred from enrolling H.R. at Lab for the 2018-19 school year. *See* AR1 369–95. However, Hearing Officer Vaden rejected Parents' assertion that the July 2018 IEP was inappropriate

insofar as it did not place H.R. in a full-time special education setting; Hearing Officer Vaden concluded that H.R. did not require a full-time special education setting and that Lab would not be a proper placement as it was not the least restrictive environment. *Id*. at 387–388.

DCPS developed a new IEP for H.R. for the 2019–20 school year (the "August 2019 IEP"), s*ee* AR1 419–36, and again proposed Murch as H.R.'s placement, *see* AR1 14. The August 2019 IEP called for fifteen total hours per week of specialized instruction outside general education, with five hours specifically reserved for reading, but all other aspects remained the same as the July 2018 IEP. *See* AR1 419, 432. Parents observed the programming offered at Murch, and again elected to unilaterally place H.R. at Lab for the 2019-20 school year. *See* AR1 14–15. Parents filed a due process complaint challenging the August 2019 IEP, and the parties reached a settlement agreement providing that the Lab is H.R.'s placement for the 2019-20 school year and DCPS would pay tuition for that year. *See* AR1 481–83.

## A. H.R.'s 2020–2021 IEP Proceedings

In April 2020, DCPS developed a new IEP for H.R.'s 2020–21 school year (the "April 2020 IEP"), which again called for fifteen hours per week of specialized instruction and the same related services as the prior IEPs. *See* AR1 515–34. The IEP again included mathematics, reading, written expression and motor skills/physical development as areas of concern. *See* AR1 518–29. The IEP noted that H.R.'s instructional level had advanced two levels and H.R. was reading at above grade level. *See* AR1 522–23. The IEP required a number of classroom aides and supports to address H.R.'s executive functioning needs. *See* AR1 531. DCPS again proposed Murch Elementary School as H.R.'s placement, and after again contacting Murch that summer to learn more about the school's programming, Parents notified DCPS that they would unilaterally place H.R. at Lab for the 2020–21 school year. *See* AR1 557–62.

### 1.  *August 2020 Complaint*

In August 2020, Parents filed a due process complaint challenging the April 2020 IEP

(the "August 2020 Complaint").  *See* AR1 39–54.  Parents quickly filed a motion for stay-put

relief, which Hearing Officer Michael Lazan ("Hearing Officer Lazan") granted, ordering

placement at Lab because Hearing Officer Vaden's 2019 HOD ordering placement at Lab for

2018–19 constituted "an 'agreement' for stay-put purposes that establishes the Student's stay-put

placement."  AR1 256.

A hearing on the August 2020 Complaint was held before Hearing Officer Lazan to

address three issues: (1) Whether DCPS denied H.R. a FAPE for failing to provide H.R. with an

appropriate IEP by not recommending full-time special education, lacking goals in executive

functioning, and failing to provide for a reading intervention; (2) Whether DCPS denied H.R. a

FAPE for failing to provide H.R. with an appropriate placement; and (3) Whether denied H.R. a

FAPE for failing to provide Parents with specific information about the proposed placement. *See*

AR1 9.

The hearing began in March 2021 and was continued to additional dates in April and

May 2021.  *See* AR1 7.  On April 6, 2021, the April 2020 IEP challenged in the August 2020

Complaint expired.  *See* AR1 530.  On April 29, 2021, DCPS developed a new IEP for H.R.'s

2021–22 school year ("April 2021 IEP") which called for the same services as the April 2020

IEP, and again proposed Murch as H.R.'s placement.  S*ee* AR1 1,087–1,104.

 Before the hearing could conclude, Parents filed a motion for a directed verdict, arguing

that the expiration of the April 2020 IEP and creation of the April 2021 IEP rendered the August

2020 Complaint moot.  *See* AR1 924–28.  The hearing nonetheless resumed, and on June 4, 2021

Hearing Officer Lazan issued a decision denying Parents' motion for directed verdict, reasoning

that a determination on the April 2020 IEP would affect the parties' future stay-put rights, which

also constituted a recurrent legal issue between the parties that meets the capable of repetition yet evading review exception to mootness.  *See* AR1 1,021–30.

On June 8, 2021, Parents filed a new due process complaint, asserting that the April 2021 IEP denied H.R. a FAPE and did not offer an appropriate placement, and invoked H.R.'s stay-put rights for the 2021–22 school year (the "June 2021 Complaint").  *See* AR1 1,105–13.  Parents then filed a motion to dismiss before Hearing Officer Lazan, again arguing that the August 2020 Complaint was moot.  *See* AR1 1,033–37.

### 2. *June 2021 HOD*

On June 21, 2021, Hearing Officer Lazan issued a decision on the August 2020 Complaint (the "June 2021 HOD").  *See* AR1 5–36.  The June 2021 HOD opens with findings of fact detailing H.R.'s educational history, evaluations, behavior, and academic progress.  *See* AR1 9–16.  Hearing Officer Lazan found that during the 2019–20 school year, H.R. made significant gains in reading, was considered a very capable writer and on grade level in mathematics, but continued to struggle with organization and motor tasks.  *See* AR1 16.

The 2021 HOD first addresses Parents' motion to dismiss, concluding that Parents' mootness claim fails, consistent with Hearing Officer Lazan's analysis of the issue in the preceding order denying their motion for directed verdict.  *See* AR1 24.  The HOD then rejects Parents' contention that the IEP was inappropriate for lack of goals in executive functioning, because H.R.'s executive functioning needs were addressed by goals in other Areas of Concern, occupational therapy services, and accommodations consistent with the Circuit Court's decision in *Z.B. v. District of Columbia*, 888 F.3d 515 (D.C. Cir. 2018).  *See* AR1 25–27.  With respect to Parents' claim that H.R. required more than the 15 hours of specialized instruction provided, the HOD concludes that the record did not reflect that H.R. was unable to manage general education

classes as he was on grade level in reading, writing, and mathematics, and his executive

functioning and attentional needs could be addressed in the general education setting by the

accommodations listed. *See* AR1 27–28.  Finally, the HOD rejects Parents' position that H.R.

requires the Orton-Gillingham methodology on his IEP because H.R.'s issues with decoding

were "virtually remediated" and Parents' witness failed to explain how Orton-Gillingham, which

DCPS witnesses described as a program for decoding, could address H.R.'s then-current issues

with comprehension, fluency, and writing, which DCPS witnesses noted could be addressed by

other programs.  *See* AR1 29–30.  In conclusion, the HOD finds that the IEP is reasonable in

light of H.R.'s growth in reading and evidence that his executive functioning issues could be

appropriately managed in the general education classroom.  *See* AR1 30–31.  The HOD rejects

Parents' challenge to the proposed placement based on unrebutted testimony that Murch

Elementary School could implement the IEP.  *See* AR1 33.  The HOD also rejects Parents' claim

that DCPS's failure to provide them with information about the proposed placement amounts to a

denial of a FAPE for lack of authority supporting that claim.  *See* AR1 34.  On July 12, 2021,

Parents appealed the June 2021 HOD to this Court.  *See* Compl., ECF No. 1.

## B. H.R.'s 2021–2022 IEP Proceedings

On April 29, 2021, DCPS developed a new IEP for H.R.'s 2021–22 school year ("April

2021 IEP") which identified the same areas of concern, called for the same services, and again

proposed Murch as H.R.'s placement.  S*ee* AR2 514–31.  The April 2021 IEP noted that H.R.

"made quantifiable and noticeable progress in his development of reading skills," but that H.R.

was "highly distractible," "impulsive," and "inattentive" during a September 2020 observation.

AR2 517–18.  This IEP contained the same classroom aides and supports to address H.R.'s

executive functioning needs identified by Hearing Officer Lazan in the June 2021 HOD.  *See* AR

524–26, 528; *see* AR1 26–28 (discussing portions of April 2020 IEP that address executive functioning).

As noted above, Parents filed a due process complaint challenging the April 2021 IEP in June 2021. *See* AR1 1,105–13. After the June 2021 HOD was issued and Parents filed their appeal with this Court, Parents withdrew their June 2021 Complaint but notified DCPS that they nonetheless intended to continue H.R.'s enrollment at Lab School for the 2021–22 school year. *See* AR2 886–88.

### 1. *December 2021 Complaint*

On December 20, 2021, DCPS filed its own due process complaint ("December 2021 Complaint") asserting that the April 2021 IEP and proposed placement at Murch Elementary School for H.R.'s 2021–22 school year were appropriate and seeking an order confirming that DCPS made a FAPE available to H.R. and Lab was not a proper placement. *See* AR2 34–52. Parents immediately filed a motion to dismiss the December 20201 Complaint for failure to state a claim, lack of jurisdiction given the pending appeal before this Court, and mootness. *See* AR2 76–82. Hearing Officer Terry Michael Banks ("Hearing Officer Banks") denied the motion on the first two grounds without reaching the issue of mootness. *See* AR2 193–98.

A hearing on the December 2021 Complaint was held before Hearing Officer Banks to address two issues: (1) Whether DCPS provided H.R. with an appropriate IEP by "providing fifteen (15) hours of specialized instruction outside of general education"; and (2) whether DCPS provided H.R. with an appropriate placement. AR2 8. The hearing was conducted in February and March 2022. *See* AR2 4.

In between the February and March hearing dates, DCPS conducted its annual review of H.R.'s April 2021 IEP and proposed a new IEP (the "March 2022 IEP"). *See* AR2 1,051–72.

Parents then filed a second motion to dismiss the December 2021 Complaint for lack of
jurisdiction given the appeal before this Court and on mootness grounds. *See* AR2 1,011–23.
On May 5, 2022, Hearing Officer Banks denied Parents' motion to dismiss, finding that he had
jurisdiction over the December 2021 Complaint because the April 2021 IEP was not before this
Court and the Complaint was not moot because a finding on the appropriateness of the April
2021 IEP would determine DCPS's obligation to fund H.R.'s placement for the 2021–22 school
year. *See* AR2 1,146–50.

### 2. *May 2022 HOD*

On May 9, 2022 Hearing Officer Banks issued a determination on the December 2021
Complaint (the "May 2022 HOD"), finding that DCPS met its burden of proving that the April
2021 IEP provided H.R. with a FAPE and Murch Elementary School could implement the IEP.
*See* AR2 4–31. The May 2022 HOD opens with extensive findings of fact detailing not only
H.R.'s educational history, evaluations, behavior, and academic progress, but also the substance
of each witnesses' testimony. *See* AR2 8–22. Hearing Officer Banks' analysis begins by
establishing that Parents' objection to the April 2021 IEP is based on their opinion, and their
witnesses' opinion, that H.R. requires full-time specialized instruction in a special education
program. *See* AR2 24. The HOD first concludes that objective data indicates that H.R. is
performing at or above grade level in reading, math, and writing, and that "relatively benign
findings on the Conners and the BRIEF-2" executive functioning assessments suggest that H.R.'s
executive functioning deficits do not have a significant effect on classroom performance. AR2
26. The HOD goes on to assert that H.R.'s academic performance "would not, by itself, warrant
15 hours per week of specialized instruction, if any at all," and so "15 or more hours… cannot be
justified unless [Parents'] witnesses are correct that [H.R.] requires a small class environment."

AR2 27.  The HOD then discredits Parents' witnesses' opinion that H.R. requires a small class

environment as speculative and unsupported by the record.  *See* AR2 27–28.  The HOD proceeds

to establish that the proposed placement could implement the April 2021 IEP and, in closing,

concludes that DCPS met its burden of proving that the April 2021 IEP and placement were

reasonably calculated.  *See* AR2 28.

### C.  H.R.'s 2022–23 and 2023–24 IEP

In March 2022, the parties convened to issue H.R.'s IEP for the 2022-23 school year

("March 2022 IEP").  Notably, the March 2022 IEP identifies H.R. as a student with just an

"Other Health Impairment" due to Attention Deficit Disorder or Attention Deficit Hyperactivity

Disorder pursuant to a 2021 psychological reevaluation finding that H.R. no longer met the

criteria for having a Significant Learning Disability.  *See* AR2 492; 503–13; 1,051.  Otherwise,

the March 2022 IEP proposes the same services as the April 2020 and April 2021 IEPs.

*Compare* AR2 1,051–72; *with* AR1 515–34; *and* AR1 1,087–1,104.  H.R. nonetheless remained

enrolled at Lab the 2022-23 school year pursuant to this Court's order determining that Lab is

H.R.'s "stay-put" placement for the pendency of the litigation, consistent with Hearing Officer

Lazan's earlier stay-put order.  *See H.R. v. District of Columbia*, No. 21-cv-01856, 2022 WL

2110503 (D.D.C. Apr. 29, 2022), *report and recommendation adopted*, 2022 WL 2106245

(D.D.C. June 10, 2022).

In March 2023, the parties convened to update H.R.'s IEP for the 2023–24 school year

("March 2023 IEP").  DCPS again proposed fifteen hours per week of specialized instruction

outside of the general education classroom, 180 minutes per month of Occupational Therapy

outside of the general education setting, and thirty minutes per month of consultation services in

Occupational Therapy.  *See* Pl. Supp. at 1; Def. Supp. at 1.  DCPS proposed placement at H.R.'s

local DCPS middle school, given his age and grade level.  *Id.*  The hours of specialized

instruction are the same as those in the challenged April 2020 and April 2021 IEPs.  *See* AR1

515–34; AR1 1,087–1,104.  This is H.R.'s current and controlling IEP.

Parents state that they object to the March 2023 IEP and placement as they "continue to

believe that H.R. requires placement in a full-time special education program for his entire

school day, while the school system has only proposed special education services for H.R. for

approximately half of his school week."  Pl. Supp. at 2.  Parents maintained H.R.'s enrollment at

Lab for the 2023–2024 school year over DCPS's objection.  *See* Pl. Supp. Ex. 2, ECF No. 31–2.

The undersigned is not aware of any due process complaint concerning the March 2023 IEP.

### D.  **The Present Case**

In July 2021, Parents appealed the June 2021 HOD to this Court.  *See* Compl.  In

December 2021, Parents filed a motion for preliminary injunction to enforce H.R.'s stay-put

rights at Lab as DCPS had stopped funding H.R.'s tuition, as ordered by Hearing Officer Lazan,

beginning in September 2021.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 4.  The undersigned

issued a Report and Recommendation, finding that Lab School was H.R.'s stay-put placement

per Hearing Officer Vaden's 2019 HOD, which District Judge Timothy J. Kelly subsequently

adopted in June 2022.  *See H.R.*, 2022 WL 2110503 at *1, *adopted*, 2022 WL 2106245.  Under

this order, H.R. will remain funded at Lab by DCPS through the pendency of Parents' appeal.

Parents subsequently amended their complaint to include an appeal of the May 2022

HOD.  *See* Am. Compl., ECF No. 15.  The operative complaint now alleges that: (1) the Hearing

Officers committed error in not finding the due process complaints moot; (2) DCPS deprived

H.R. of a FAPE; (3) the Hearing Officers failed to order DCPS to place and fund H.R. in an

appropriate program and placement; and (4) the Hearing Officers failed to render a proper

13

decision through an accurate and impartial understanding of the facts, and application of the correct legal standards. *Id.* ¶¶ 69–76. As relief, Parents seek a declaratory judgment that DCPS violated H.R.'s rights and an order to place and fund H.R. at Lab and declare it as his current educational placement under the IDEA. *Id.* at 13. The District answered on August 2, 2022. *See* Answer, ECF No. 14. The parties then filed their competing motions for summary judgment.

After reviewing the cross-motions, the undersigned ordered supplemental briefing regarding the status of H.R.'s IEP and educational placement for the 2023–24 school year and the parties' respective positions on whether this case presents a live justiciable controversy given the development of a superseding IEPs for the 2022–23 school year and 2023–24 school year. *See* Sept. 25, 2023 Min. Order. The parties then filed their respective supplemental briefing. The motions are now fully briefed and ripe for this Court's adjudication.

## LEGAL STANDARD

Although styled as motions for summary judgment, the cross-motions before the Court more accurately seek review of Hearing Officers Lazan's and Banks' HODs. *See S.B. v. District of Columbia*, 783 F. Supp. 2d 44, 50 (D.D.C. 2011). When neither party puts forth additional evidence, a motion for summary judgment "operates as a motion for judgment based on the evidence comprising the record." *Jenkins v. District of Columbia*, No. 02-cv-01055, 2005 WL 3371048, at *1 (D.D.C. 2005). The party challenging the hearing officer's determination must "at least take on the burden of persuading the court that the hearing officer was wrong" by a preponderance of the evidence. *Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 521 (D.C. Cir. 2015) (quoting *Kerkam v. McKenzie* (*Kerkam I*), 862 F.2d 884, 887 (D.C. Cir. 1989)); *see Brown v. District of Columbia*, No. 17-cv-00348, 2019 WL 3423208, at *6 (D.D.C. July 8,

2019) ("The party challenging the [HOD] must show by a preponderance of the evidence that the hearing officer's decision is incorrect.").

The IDEA standard of review is "more rigorous" and less deferential than that applied to review of administrative decisions under the Administrative Procedure Act. *Reid*, 401 F.3d at 521. "[T]his standard does not authorize unfettered de novo review." *Brown v. District of Columbia*, 179 F. Supp. 3d 15, 23 (D.D.C. 2016). "[O]n pure questions of law, such as the IDEA's proper statutory construction, the standard of review is de novo." *Damarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 43 (D.D.C. 2016) (citing *Reid*, 401 F.3d at 521). Otherwise, courts must give "due weight" to the hearing officer's determination and may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). However, "a hearing decision without reasoned and specific findings deserves little deference." *Reid*, 401 F.3d at 521 (quoting *Kerkam v. Superintendent, D.C. Pub. Sch.* (*Kerkam II*), 931 F.2d 84, 87 (D.C. Cir. 1991)) (internal quotation marks omitted). "In such a case, a 'district court may determine that the appropriate relief is a remand to the hearing officer for further proceedings.'" *Malloy v. District of Columbia*, No. 20-cv-03219, 2022 WL 971208, at *4 (D.D.C. Mar. 30, 2022) (quoting *Kerkam II*, 931 F.2d at 526). Otherwise, a district court must base "its decision on the preponderance of the evidence" and grant such relief as appropriate. 20 U.S.C. § l415(i)(2)(C)(iii).

## DISCUSSION

Parents claim that Hearing Officers Lazan and Banks erred by: (1) failing to dismiss the August 2020 and December 2021 Complaints as moot; (2) improperly giving deference to DCPS witnesses; (3) ignoring DCPS's failure to program for H.R.'s reading disability, executive

functioning deficits, and his need for full-time specialized instruction; (4) denying Parents meaningful participation in the placement process and erring in finding Murch an appropriate placement for H.R.; and (5) failing to consider the harmful effects of moving H.R. out of his placement at Lab School.  Parents further argue that a DCPS-funded placement at Lab is proper.

The District responds that the Hearing Officers properly denied Parents' motions to dismiss on mootness grounds, properly weighed witness testimony and made appropriate creditability determinations, and correctly found that the April 2020 and April 2021 IEPs offered H.R. a FAPE.  The District further argues that Parents were afforded the opportunity to participate in the placement process, Murch Elementary School was an appropriate placement, and Parents failed to exhaust their claim regarding the alleged failure to consider the effects of transitioning H.R. to Murch—which regardless lacks merit.  Finally, the District maintains that DCPS is not required to fund H.R.'s placement at Lab.

In the supplemental briefing, Parents now assert that this action is moot like the August 2020 and December 2021 Complaints.  The District disagrees, and argues that if this action were moot, the capable of repetition yet evading review exception applies.  The undersigned will address these arguments in turn below, beginning with whether the present case is moot and considering the remaining arguments in the order presented in Parents' motion.

## I.    Mootness

Parents claim that both Hearing Officer Lazan and Hearing Officer Banks wrongly denied their motions to dismiss the underlying due process complaints as moot.  As mootness is a pure question of law, the undersigned will address the mootness of the due process complaints

below de novo.[4]  *See Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (question of mootness reviewed de novo).  However, because mootness deprives the court of subject matter jurisdiction, the undersigned must first consider Parents' argument that the case before this Court is moot.  *See Indian River Cty. v. Rogoff*, 254 F.Supp.3d 15, 18 (D.D.C. 2017); *see also Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has ... subject-matter jurisdiction.").

### A.  <u>The Present Case</u>

Consistent with their claims that the August 2020 and December 2021 Complaints were moot, Parents now argue that this case is moot because DCPS has proposed new IEPs and placements for H.R. and Parents have no outstanding claims for relief as H.R.'s tuition at Lab has been paid under this Court's stay-put order.  *See* Pl. Supp. at 2–5.  The District disagrees, arguing principally that a decision by this Court would affect Parents' ability to rely on Hearing Officer Lazan's 2019 HOD to maintain H.R.'s funding at Lab under the stay-put provision in future due process proceedings.  *See* Def. Supp. at 3–4.  The District also argues that the case meets the exception to mootness for issues capable of repetition yet evading review, due to ongoing stay-put issue as well as the parties' "'irreconcilable views' on certain aspects of [H.R.'s] IEP."  *Id.* at 5 (quoting *N.S. by & through S.S. v. District of Columbia*, 272 F. Supp. 3d 192, 195 (D.D.C. 2017)).

"Article III, Section 2 of the Constitution permits federal courts to adjudicate only actual, ongoing controversies."  *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55

---

[4] The issue here is not whether the due process complaints are *now* moot, which neither party has argued, but whether they *were* moot when the Hearing Officers issued their rulings.

(D.C. Cir. 2001) (internal quotations omitted).  "Even where litigation poses a live controversy

when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events

have so transpired that the decision will neither presently affect the parties' rights nor have a

more-than-speculative chance of affecting them in the future."  *Clarke v. United States*, 915 F.2d

699, 701 (D.C. Cir. 1990) (en banc) (internal quotations omitted).  Thus courts are prohibited

from deciding a case "when it is impossible ... to grant any effectual relief whatever to the

prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  In the IDEA context, this court

has been clear that "in appropriate circumstances, the development of a new IEP may render a

challenge to a prior IEP moot, for example, when the new IEP resolves the previous subject of

dispute."  *N.W. v. District of Columbia*, 253 F. Supp. 3d 5, 14 (D.D.C. 2017).

### 1.  *The Case Before this Court is Not Moot.*

Parents stake their claim of mootness on *J. T. v. District of Columbia*, 983 F.3d 516 (D.C.

Cir. 2020).  *See* Pl. Supp. at 3–4.  In *J.T.*, the Circuit Court affirmed the dismissal of an appeal

challenging a superseded IEP on mootness grounds, finding that no effectual relief could be

granted.  The court's reasoning turned on the relief sought: a judgment declaring the IEP

inadequate and an order to amend it, but no retrospective relief to address the alleged denial of a

FAPE.  *J.T.*, 983 F.3d at 522.  The court held that an order amending the superseded IEP would

not be effectual as that IEP "no longer govern[ed]" the student's education.  *Id.*  And, entering a

declaratory judgment regarding the IEP would have no effect either, because the superseded IEP

"cannot serve as the baseline for future IEP negotiations because it has already been replaced by

a subsequent IEP . . . [that] all parties agreed to."  *Id.*

Like the plaintiff in *J.T.*, Parents demand a declaratory judgment that the superseded IEPs

were inadequate.  *See* Compl. at 13.  But, unlike the parties in *J.T.*, the parties here do not agree

on H.R.'s most recent IEP from March 2023.  *See* Pl. Supp. at 2; Def. Supp. at 2.  Critically, this

disagreement is the same one that brings H.R.'s April 2020 and May 2021 IEPs before this

court—Parents believe that H.R. requires full-time specialized instruction, and DCPS continues

to propose fifteen hours per week of specialized instruction.  *Id.*  The ongoing nature of this

dispute certainly weighs against finding this case moot.  *Cf. N.W.*, 253 F. Supp. 3d at 14 (noting

that development of new IEP may render case moot where it resolves the subject of dispute);

*Turner v. District of Columbia*, 952 F.Supp.2d 31, 39–40 (D.D.C. 2013) (finding claim moot

when new IEP addressed plaintiff's objection to the previous IEP); *Bowling v. District of

Columbia*, No. 11-cv-02145, 2013 WL 5214948, at *4 (D.D.C. Sept. 16, 2013) ("[S]uch claim

has been rendered moot by . . . Plaintiff's agreement with the IEP for the 2012–13 school year.").

　　　Unlike the plaintiff in *J.T.*, Parents also demand that the court "place and fund H.R. at the

Lab School . . . and declare it to be his current educational placement."  Compl. at 13.  "The

Court could grant [Parents] this prospective relief, and the case is thus not moot."  *N.W.*, 253 F.

Supp. 3d at 13; *see also Morris v. District of Columbia*, 38 F. Supp. 3d 57, 66 (D.D.C. 2014) ("A

case ... is not moot so long as any single claim for relief remains viable, whether that claim was

the primary or secondary relief sought.") (internal quotation omitted).

　　　Alternatively, the District argues that the case is not moot because a determination on the

merits here "will conclusively determine the parties' present legal rights as to whether [Parents]

may still rely on the 2019 HOD as an implied-agreement between the parties on H.R.'s stay-put

placement."  Def. Supp. at 4.  "[C]ourts traditionally treat the IEP in place prior to the challenged

IEP as the controlling IEP for purposes of the 'stay-put provision.'"  *G.B. v. District of Columbia*,

78 F. Supp. 3d 109, 113 (D.D.C. 2015).  But an administrative decision endorsing the parent's

unilateral placement over an inadequate IEP and placement functions as an "agreement"

regarding placement which can control the students' stay-put placement. *See A.D. v. Dist. of Columbia*, No. 20-cv-02765, 2021 WL 354175 (D.D.C. Feb. 2, 2021) (citing 34 C.F.R. § 300.518(d) ("If a hearing officer in a due process hearing ... agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents.")). This Court previously held that the 2019 HOD by Hearing Officer Vaden ordering reimbursement for H.R.'s enrollment at Lab for the 2018–19 school year constitutes an "agreement" that is determinative of H.R.'s stay-put placement. *See H.R.*, 2022 WL 2110503, at *6, *adopted*, 2022 WL 2106245.

The undersigned agrees that, should this court affirm the subsequent HODs, Parents may no longer invoke the 2019 HOD as an agreement governing H.R.'s stay-put placement in future proceedings. The subsequent HODs, and the IEPs that they approved of, will function as the "the IEP in place" should Parents challenge H.R.'s current IEP and will be considered in the stay-put placement determination. *G.B.*, 78 F. Supp. 3d at 113. If this Court were to dismiss the appeal, however, "DCPS could lose a legal defense to any claim for stay-put funding" in the future as Parents may continue to rely on the 2019 HOD as establishing Lab as H.R.'s placement. *N.S.*, 272 F. Supp. 3d at 199. This result will "have a more-than-speculative chance of affecting [the parties' rights] in the future," as Parents have consistently challenged H.R.'s IEP for the last five years and used the stay-put provision and the 2019 HOD to maintain DCPS funding of H.R.'s enrollment at Lab, and are likely to continue to do so if their demands are not met. *Clarke*, 915 F.2d at 701. In fact, another due process complaint—and the consequent opportunity to invoke H.R.'s stay-put rights and rely on the 2019 HOD to maintain his enrollment at Lab—seems likely if this court affirms the HODs before it, especially because Parents have indicated that they dispute H.R.'s current IEP. *See generally* Pl. Supp. The above

20

is sufficient to establish a live controversy, and therefore the undersigned recommends that this Court reject Parents' mootness argument and find that it has subject matter jurisdiction over the matter.

### 2. *The Capable of Repetition Yet Evading Review Exception Applies to this Case.*

Even if this case were technically moot, the capable of repetition yet evading review exception would apply. "The doctrine of 'capable of repetition yet evading review' is an exception to mootness for cases where the party can demonstrate that '(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Zearley v. Ackerman*, 116 F. Supp. 2d 109, 112 (D.D.C. 2000) (quoting *United States v. Weston*, 194 F.3d 145, 148 (D.C. Cir. 1999)) (alterations omitted).

The first prong is easily satisfied, as "there can be no doubt that a one-year placement order under the IDEA is, by its nature, 'too short [in duration] to be fully litigated prior to its . . . expiration.'" *J. T.*, 983 F.3d at 524 (citation omitted) (alteration in original); *see also Patrick G. by & through Stephanie G. v. Harrison Sch. Dist. No. 2*, 40 F.4th 1186, 1200 (10th Cir. 2022) (same); *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 599 (7th Cir. 2006) (same); *Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 31 (1st Cir. 2001) (same).

Whether the second prong is satisfied is a closer question in IDEA cases. Generally, the party invoking the exception must show "a reasonable degree of likelihood that the issue will be the basis of a continuing controversy between these two parties," *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quotations omitted), "in terms of the legal questions it presents for decision," *PETA v. Gittens*, 396 F.3d 416, 422–23 (D.C. Cir. 2005). Thus "a 'legal controversy so sharply focused on a unique factual context' [will] rarely present 'a

reasonable expectation that the same complaining party would be subjected to the same actions again.'" *Gittens*, 396 F.3d at 424 (quoting *Spivey v. Barry*, 665 F.2d 1222, 1234–35 (D.C. Cir. 1981)). "The issue in this case—the denial of a FAPE— is inherently fact dependent, particularly where . . . the denial is based on the inappropriateness of a student's IEP and school placement." *Mundo Verde Pub. Charter Sch. v. Sokolov*, 315 F. Supp. 3d 374, 382 (D.D.C. 2018). This Circuit's "'capable of repetition' precedent in the IDEA context thus authorizes the review of recurring legal questions arising from the statute." *J.T.*, 983 F.3d at 527; *see Jenkins v. Squillacote*, 935 F.2d 303 (D.C. Cir. 1991) (concerning statutory standard for providing notice to parents); *District of Columbia v. Doe*, 611 F.3d 888, 895 (D.C. Cir. 2010) (concerning hearing officer's statutory authority to revise discipline); *Abney ex rel. Kantor v. District of Columbia*, 849 F.2d 1491, 1495–96 (D.C. Cir. 1988) (concerning statutory notice requirement). But this Circuit's precedent does not explicitly foreclose a finding that a dispute over the provision of a FAPE, although fact dependent, is capable of repetition.

This Circuit has long recognized that "[i]n estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Clarke*, 915 F.2d at 704. The August 2020 Complaint was Parents' third consecutive due process complaint challenging H.R.'s IEP and placement. *See* AR2 24–25. The subject of the first complaint, the July 2018 IEP, called for fifteen hours per week of specialized instruction—ten hours outside of the general education setting and five hours in the general education setting. *See* AR1 329. The following five IEPs all call for fifteen hours of specialized instruction, all provided outside of the general education setting. *See* AR1 419, 515, 527; AR2 1,070; Pl. Supp. at 1. Parents have objected to each IEP on the grounds H.R. requires full-time specialized education services, among other issues. *See* AR2 21–22; *see* Pl. Supp. at 1. Given DCPS's

persistence in recommending fifteen hours of specialized instruction and Parents' insistence that H.R. requires full-time special education for the last six school years, it is reasonably likely that, if not resolved by this Court, this specific dispute would reoccur in the future exactly as it has in the past. *See N.S.*, 272 F. Supp. 3d at 195 (quoting *N.S. v. District of Columbia*, No. 16-cv-00306, Report & Recommendation at 28–29, ECF No. 26) (noting that the exception is "particularly applicable" where "parties to continue to articulate 'irreconcilable views' on certain aspects of [student's] IEP") ; *see also Arroyo-Delgado v. Dep't of Educ. of Puerto Rico*, 199 F. Supp. 3d 548, 556–57 (D.P.R. 2016) (finding that the capable of repetition yet evading review exception applied because "it is likely that plaintiffs' concerns over the adequacy of [the] IEP will repeat for subsequent IEPs").

Further, when a party to a due process complaint seeks dismissal on mootness grounds based on a superseding IEP, the party "must show not only that a new IEP has been developed but that it resolves or avoids the issues of dispute here." *N.W.*, 253 F. Supp. 3d at 14 n.9. Parents can make no such showing with respect to the IEPs before this Court, as H.R.'s current IEP provides the same challenged accommodations and placements that are at issue here. Dismissing this case on mootness grounds would "not only den[y] review of an issue capable of repetition yet evading review, but incentivize[] a strategy of delaying review of IEPs until the school year is over." *Arroyo-Delgado*, 199 F. Supp. 3d at 556. Accordingly, even if the case before this Court were technically moot, it would be reviewable under the capable of repetition yet evading review exception; the undersigned therefore recommends that if the Court concludes that the case is technically moot, the Court apply this exception to the mootness doctrine and consider the parties' claims on the merits.

**B.  <u>The August 2020 Complaint</u>**

In the June 21, 2021 HOD, Hearing Officer Lazan denied Parents' assertion that their

complaint was moot because the April 2020 IEP had been replaced, concluding that H.R.'s

future stay-put rights remained at issue.  *See* AR1 18–21.  As noted above, Parents' August 2020

complaint alleged that April 2020 IEP was inadequate because it, *inter alia*, failed to provide full

time special education for H.R.  In concluding that the complaint was not moot, Hearing Officer

Lazan relied on the analysis in his earlier order denying Parents' motion for directed verdict.  *See*

AR1 22.  There, he concluded that there was a "more-than-speculative chance that a decision on

the merits of this case will affect the parties in the future" because if Parents prevailed, DCPS

would have to fund H.R. at Lab in future proceedings under the stay-put provision, and if DCPS

prevailed, Parents would lose their entitlement to stay-put funding at Lab. AR1 1026–27.

Hearing Officer Lazan rejected Parents' counterargument that an adverse administrative decision

would have no impact on H.R.'s stay-put rights because they would appeal it, emphasizing that

"the decision of a special education hearing officer is entitled to due weight during the review of

an HOD by a federal court."  AR1 24 (internal quotation marks and citation omitted).  In other

words, the complaint was not moot because Hearing Officer Lazan's decision on the complaint,

which would affect Parents' stay-put rights, would bear heavily on the reviewing court's

decision.

Parents now argue that Hearing Officer Lazan erred when he did not dismiss the August

2020 Complaint as moot.  *See* Pl. Mem. at 10.  They assert that there were no live issues for

Hearing Officer Lazan to address or relief to award because the April 2020 IEP was no longer

effective and H.R. was funded at Lab through the 2020-21 school year under the stay-put

provision.  *See id.* at 11–12.  To support this argument, Parents rely heavily on the Circuit

Court's decision in *J.T.  See id.* at 10–12.

24

The District responds that Hearing Officer Lazan properly denied Parents' motion to dismiss the August 2020 Complaint as moot. *See* Def. Mem. at 12. The District describes Parents' efforts to dismiss the case through the lens of Rule 41 voluntary dismissal, claiming that Hearing Officer Lazan properly acted within his discretion to deny Parents' motion. *See* Def. Reply at 2 (citing Fed. R. Civ. P. 41(a)). The District otherwise claims that the August 2020 Complaint was not moot because the resolution of the dispute would implicate H.R.'s future stay-put rights in future litigation. *See id.* at 13 (citing *N.S.*, 272 F. Supp. 3d 192). Moreover, the District suggests that the "capable of repetition yet evading review" mootness exception applies because if the August 2020 Complaint had been dismissed, Parents could have then challenged the April 2021 IEP (as they ultimately did), and again invoked H.R.'s stay-put rights (which in fact they did), leading to a cycle where DCPS would continually pay for H.R.'s placement at Lab through the IDEA's stay-put provision without ever receiving an ultimate disposition as to the appropriateness of his IEPs and placement. *See id.* at 13–14.

### 1. *The August 2020 Complaint Was Not Moot.*

Hearing Officer Lazan concluded that *J.T.* was distinguishable, *see* AR1 at 20, and the undersigned agrees. In *J.T.*, the parties agreed to the superseding IEP, and the parents had acknowledged that their child's needs had decreased, resulting in fewer services in the superseding IEP that resolved the dispute about the IEP on appeal. *See* 983 F.3d at 525. Here, Parents did not agree to the superseding IEP, as evidenced by their contemporaneous filing of a due process complaint against the superseding March 2021 IEP, nor did the superseding IEP resolve the parties' dispute. Furthermore, the underlying opinion affirmed in *J.T.* noted that J.T.'s "claims about the adequacy of [the IEP] might still present a live controversy if DCPS had not developed a new IEP or had developed a new IEP without addressing the alleged

shortcomings of the challenged version." *J.T. v. District of Columbia*, No. 17-cv-01319, 2019 WL 3501667, at \*6 (D.D.C. Aug. 1, 2019), *aff'd*, 983 F.3d 516 (emphasis added) (citing *N.W.*, 253 F. Supp. 3d at 14).  That is precisely the situation presented before Hearing Officer Lazan— Parents' claims about the adequacy of the April 2020 IEP persisted because the April 2021 IEP did not address them and thus constituted a live controversy before Hearing Officer Lazan.

      Notwithstanding the persistence of the substantive issues before Hearing Officer Lazan, the undersigned alternatively recommends finding that the complaint was not moot because Hearing Officer Lazan's determination on the merits would have affected Parents' legal rights and DCPS's legal obligations under the stay-put provision.  As noted, Hearing Officer Lazan granted Parents' motion for stay-put relief, placing H.R. at Lab on the understanding that Hearing Officer Vaden's 2019 HOD ordering placement at Lab constituted an "agreement" setting H.R.'s stay-put placement.  *See* AR1 256.  If Hearing Officer Lazan went on to determine that Lab was not a proper placement, Parents would no longer be able invoke the 2019 HOD as an "agreement" requiring a stay-put placement at Lab.  Rather, Hearing Officer Lazan's HOD would function as the "the IEP in place" for a stay-put placement if Parents challenged H.R.'s April 2021 IEP without appealing—and thus extending the stay-put order tied to—that HOD. *G.B.*, 78 F. Supp. 3d at 113.  If Hearing Officer Lazan determined that Lab was H.R.'s proper placement, or ordered placement at Lab like Hearing Officer Vaden, Parents would be able to rely on his determination as an "agreement" requiring stay-put placement at Lab in the future and DCPS may not have any legal basis to challenge that placement. *See N.S.*, 272 F. Supp. 3d at 199 (suggesting that "DCPS could lose a legal defense to any claim for stay-put funding" in challenge to following IEP if appeal of superseded IEP is dismissed).  It is clear that Hearing Officer Lazan's determination would have had "a more-than-speculative chance of affecting [the

parties' rights] in the future" at that time as Parents had already filed another complaint challenging the following IEP under which they likely would, if they did not appeal Hearing Officer Lazans' HOD, invoke the stay-put provision again. *Clarke*, 915 F.2d at 701. The undersigned therefore recommends that Hearing Officer Lazan be affirmed on this issue.

### 2.  *The Capable of Repetition Yet Evading Review Exception Applies.*

Even if the August 2020 Complaint were moot, the capable of repetition yet evading review exception would apply for the reasons discussed above. The "evading review" prong is satisfied, as "there can be no doubt that a one-year placement order under the IDEA is, by its nature, 'too short [in duration] to be fully litigated prior to its . . . expiration.'" *J. T.*, 983 F.3d at 524 (citation omitted) (alteration in original).

The "capable of repetition" prong is also satisfied. The August 2020 Complaint was Parents' third consecutive due process complaint challenging H.R.'s IEP and placement. *See* AR2 21–22. The August 2019, April 2020, and April 2021 IEPs called for nearly-identical services, *see* AR1 419, 515, 527, and Parents challenged them primarily on the grounds that H.R. required full-time special education, *see* AR2 21–22. Given the yearly recurring nature of this dispute, it is reasonably likely that, if not resolved, it would reoccur in the future. *See Arroyo-Delgado*, 199 F. Supp. 3d at 556–57. Further, given the length of due process proceedings and the District's obligation to provide a new IEP annually, "it is entirely possible that . . . [a challenge to H.R.'s following IEP] may again be found moot by a hearing officer, making [the] claim capable of repetition, yet evading review." *Morris*, 38 F. Supp. 3d at 68. To dismiss the August 2020 Complaint on mootness grounds would likely "incentivize[] a strategy of delaying review of IEPs until the school year is over." *Arroyo-Delgado*, 199 F. Supp. 3d at 556.

Finally, when a party to a due process complaint seeks dismissal on mootness grounds based on a superseding IEP, the party "must show not only that a new IEP has been developed but that it resolves or avoids the issues of dispute here." *N.W.*, 253 F. Supp. 3d at 14 n.9. Parents could make no such showing at the time they claimed that the August 2020 Complaint was moot, because the April 2021 IEP provided the very same services and placement as the April 2020 IEP thus repeating the parties' dispute. Accordingly, the undersigned finds that August 2020 Complaint, even if moot, met the capable of repetition yet evading review exception, and recommends that Hearing Officer Lazan be affirmed on this issue.

## C.  **The December 2021 Complaint**

On May 5, 2022, Hearing Officer Banks rejected Parents' mootness argument regarding DCPS's December 2021 Complaint. Parents argued, again, that DCPS's Complaint was moot because the April 2021 IEP at issue had expired and been replaced in March 2022. *See* AR2 1011–17. At that time, the "stay put provisions provide[d] relief to Student for the 2021-22 school year," thus obligating DCPS to pay for H.R.'s tuition that year. AR2 1148. But, DCPS had "honored H.R.'s stay-put placement at Lab School between the April 2020 IEP meeting and the end of September 2021," leaving several months of tuition unpaid at the time that mootness was raised. Parents' Reply to Opp. to Mot. for Prelim. Inj. at 8–9, ECF No. 6. Thus the District argued in opposition that a determination by Hearing Officer Banks would affect DCPS's outstanding obligation to fund H.R.'s tuition for the 2021–22 school year, citing *Sinclair on behalf of O.S. v. District of Columbia*, No. 19-cv-00434, 2022 WL 2513501, *4 (D.D.C. Feb. 9, 2022), for the proposition that if "the students' IEP was appropriate there was no longer a right to reimbursement." AR2 1081.

Hearing Officer Banks concluded that the Complaint was not moot because DCPS's payment of the outstanding tuition due on H.R.'s placement at Lab for 2021–22 "is warranted only if it has not offered a FAPE." AR2 at 1149. That is, a determination that the April 2021 IEP provided H.R. a FAPE for the 2021-22 school year would eliminate DCPS's obligation to pay for H.R.'s tuition at Lab for that year. Parents now argue that "since H.R. remained funded at Lab School during the 2020-21 and 2021-22 school years by DCPS pursuant to his 'stay put' rights, there was no possible reimbursement or outstanding issue . . . or any effectual relief that the Hearing Officer[] could have awarded." Pl. Mot. at 11–12. The District maintains that a ruling in their favor by Hearing Officer Banks would have provided "retrospective relief, *i.e.*, insulation from . . . obligation to pay for H.R.'s past private schooling." Def. Mem. at 14–15.

### 1. *The December 2021 Complaint Was Moot.*

For lack of other available relief, the mootness of the December 2021 Complaint turns on whether a determination by Hearing Officer Banks could have eliminated DCPS's obligation to fund H.R.'s 2021–22 school year tuition. In the Complaint, DCPS simply sought "an order… that DCPS proposed an appropriate IEP and Placement…, made a FAPE available…, and that [Lab] is not proper." AR2 49. Like the plaintiffs in *J.T.*, DCPS sought no explicit retroactive relief or prospective relief that Hearing Officer Banks could grant. *See generally J.T.*, 983 F.3d 516. The requested order would concern only the April 2021 IEP, which had at that point expired, and the 2021-22 school year, which at that point was nearly over. Such an order would have amounted to a declaratory judgment about an IEP that "ha[d] no operative force," which would be ineffectual as it "no longer govern[ed]" H.R.'s education. *J.T.*, 983 F.3d at 522. Thus the only effectual relief the District could possibly receive from Hearing Officer Banks is the elimination of its then-outstanding obligation to fund H.R.'s 2021–22 school year.

29

First and foremost, the District's position rests on a misunderstanding of the court's ruling in *Sinclair*. *See* AR1 1081.  In *Sinclair*, the court specifically denied the plaintiff reimbursement of "*non-tuition related expenses*" from the students' unilateral placement at a private school because the "IDEA only requires for private-school *expenses* if, *inter alia*, school officials fail to provide a child a FAPE."  *Sinclair*, 2022 WL 2513501, at *4 (emphasis added) (citing *Leggett v. District of Columbia*, 793 F.3d 59 (D.C. Cir. 2015) (finding that DCPS was obligated to pay tuition for unilateral private placement where it fails to offer a FAPE)).  Even if *Sinclair* could be read as standing for the broader principle that a school district is not responsible for reimbursement of tuition at a unilateral private placement when it provides a FAPE, it is still not relevant here, as DCPS was obligated to fund H.R.'s tuition at his then-current placement under the stay-put provision.

Second, whether DCPS provided a FAPE for the school year is irrelevant to its obligations under the stay-put provision.  "[C]ourts have made patently clear that a stay-put determination must be made without consideration of the merits of the underlying dispute." *District of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 87 (D.D.C. 2012); *cf. H.R.*, 2022 WL 2110503 at *1, *adopted*, 2022 WL 2106245 ("The Court will examine the adequacy of the April 2020 IEP when it rules on the merits of the Parents' appeal; the IDEA requires that the status quo be preserved in the interim."). "This is because the stay-put provision 'represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their then current educational placement until the dispute with regard to their placement is ultimately resolved.'" *Vinyard*, 901 F. Supp. 2d at 87 (quoting *Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist.*, 386 F.3d 158, 160 (2d Cir. 2004), *supplemented sub nom. Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 112 F. App'x 89

(2d Cir. 2004) ("A claim for tuition reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP.")).

Thus denying or revoking tuition reimbursement during the pendency of litigation, "even if the changes proposed in that last IEP are ultimately found in . . . litigation to be inappropriate and inadequate, undermin[es] the very purpose of the stay-put provision to allow parents an opportunity to test the legality of a disputed educational change and placement before implementation." *A.D. v. District of Columbia*, No. 20-cv-02765, 2021 WL 354175, at *6 (D.D.C. Feb. 2, 2021). In that same vein, another court in this District stated that, "requiring parents to reimburse school districts for tuition and other expenses paid to private schools under the stay-put provision is wholly inconsistent with the intent and spirit of the provision itself." *District of Columbia v. Jeppsen ex rel. M.J.*, 468 F. Supp. 2d 107, 112 (D.D.C. 2006), *rev'd and remanded on other grounds*, 514 F.3d 1287, 1288 (D.C. Cir. 2008) (citing *Aaron M. v. Yomtoob*, No. 00-cv-07732, 2003 WL 22836308, at *6–7 (N.D. Ill. Nov. 25, 2003) (finding that requiring parents to reimburse school districts would discourage parents with limited financial resources from taking advantage of the stay-put provision and "undermine the IDEA's fundamental policy goals")).

It follows that DCPS's obligation to fund H.R.'s tuition for the 2021–22 school year under the stay-put provision would have been independent from and invulnerable to Hearing Officer Banks' determination on the merits of the April 2021 IEP. Any claim that DCPS was permitted to deny or revoke tuition reimbursement on the grounds that it provided a FAPE is inconsistent with the stay-put provision and would be unenforceable. Accordingly, there was no effectual relief that Hearing Officer Banks could have granted with respect to DCPS's obligation

to fund H.R.'s 2021–22 school year.  As it was "impossible ... to grant any [other] effectual relief whatever to the prevailing party," the undersigned recommends that this Court find the December 2021 Complaint before Hearing Officer Banks moot.  *Chafin*, 568 U.S. at 172.

## 2.  *The Capable of Repetition Yet Evading Review Exception Applies.*

Although the December 2021 Complaint was moot, it would nonetheless fall within the capable of repetition yet evading review exception for the reasons relevant to this case and the August 2020 Complaint.  The "evading review" prong is satisfied, as "there can be no doubt that a one-year placement order under the IDEA is, by its nature, 'too short [in duration] to be fully litigated prior to its . . . expiration.'"  *J.T.*, 983 F.3d at 524 (citation omitted) (alteration in original).

As for the "capable of repetition" prong, it is almost certain that if Hearing Officer Banks had dismissed the December 2021 Complaint as moot because of the development of the March 2022 IEP for H.R.'s 2022–23 school year, Parents would have then challenged the March 2022 IEP and so on.  The fact that the parties' dispute over full-time special education was before this Court has no bearing on whether the dispute would reoccur, as Parents have continued to argue that H.R. requires full-time special education despite past adverse determinations by Hearing Officers Vaden and Lazan.  *See* AR1 387–88 (concluding that H.R. does not need full-time special education in 2019 HOD); AR1 27–28 (same in 2021 HOD).

Moreover, there is no evidence in the record that H.R.'s IEP for the 2022–23 school year resolved the dispute about specialized instruction hours raised before Hearing Officer Banks.  *See N.W.*, 253 F. Supp. 3d at 14 n.9 (noting that party seeking dismissal "must show not only that a new IEP has been developed but that it resolves or avoids the issues of dispute").  In fact, the April 2022 IEP submitted to Hearing Officer Banks with Parents' motion indicates that the

parties' dispute about full-time special education had continued, stating "[i]t is important to note that [H.R.] is attending a Special Education Day School . . . [t]here are potential harmful effects such placement limits his exposure to general education peers." AR2 1070. This is further evidence of the recurring nature of the parties' dispute. Thus the December 2021 Complaint was reviewable because the dispute therein was capable of repetition yet evading review, and the undersigned recommends that the Court affirm Hearing Officer Banks' ultimate rejection of Parents' mootness arguments.

### 3. *Parents' Supremacy Clause Argument*

As an accompaniment to their mootness argument, Parents also assert that Hearing Officer Banks "erred when he ignored the effect of the appeal before this Court" on his jurisdiction over the December 2021 Complaint because "claims regarding the 2021–22 school year were before this court at the time" as a result of invoking H.R.'s stay-put rights through the pendency of the appeal. Pl. Mem. at 14–15. Parents argued below that because H.R. "will remain funded at Lab School for at least the start of the 2021–22 school year" through the stay-put provision and because they seek prospective placement at Lab, Hearing Officer Banks was therefore precluded by the Supremacy Clause from proceeding on the merits of the December 2021 Complaint. AR2 79–80; *see also* AR2 1018. Hearing Officer Banks rejected this argument, explaining that "the district court will adjudicate the appropriateness of the IEP and placement for school year 2020–21, while the Complaint in this matter addresses the program and placement for the 2021–22 school year," and the stay-put relief sought from the district court "is related to claims relating to the 2020–21 school year." AR2 1148.

Parents offer no precedent, let alone analysis of the Supremacy Clause, to support their position. As explained by Hearing Officer Banks, the adequacy of the March 2021 IEP was not

before this Court, and therefore there was no overlap in the substantive claims before this Court and Hearing Officer Banks.  Further, because Hearing Officer Banks could not issue an order that would affect DCPS's obligation to fund H.R.'s placement under the stay-put provision, as discussed above, there was no risk of conflict with this Court on that matter.  The undersigned recommends that the Court affirm Hearing Officer Banks on this issue.

## II.   The Hearing Officer's Analysis and Conclusions Regarding H.R.'s IEPs and Placements

Having rejected Parents' mootness arguments, this Report and Recommendation turns to the merits of Parents' challenge to the relevant HODs.  Parents argue, *inter alia*, that the Hearing Officers should have found that H.R. was denied a FAPE because the April 2020 and April 2021 IEPs and placements were inadequate.  Each of Parents' arguments is addressed below in turn.

### A.   Deference Afforded to School Officials and Reasoning Provided by Hearing Officers

Parents argue that both Hearing Officers improperly deferred to DCPS witnesses despite a lack of "cogent or responsive explanation . . . [and] concerns regarding the credibility of the DCPS witnesses," and improperly dismissed Parents' witnesses' opinions.  Pl. Mem. at 17–20. The District responds that both Hearing Officers properly "weighed the conflicting documentary evidence and testimony presented at the hearings and both found DCPS's witnesses to be more persuasive."  Def. Mem. at 27–28.

"It is undisputed that a hearing officer is entitled to make reasonable credibility determinations and, in the absence of extrinsic evidence to the contrary, those determinations are entitled to deference from the Court."  *Wimbish v. District of Columbia*, 381 F. Supp. 3d 22, 29 n.5 (D.D.C. 2019) (internal quotations omitted); *see also R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89–90 (D.D.C. 2005) ("Where the Hearing Officer's findings are

based on credibility determinations of live witness testimony, . . . and there is no supplementation of the record before the Court, particular deference is due to the Hearing Officer's decision."). Courts must give "'due weight' to the administrative proceedings and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education." *Long v. District of Columbia*, 780 F. Supp. 2d 49, 59 (D.D.C. 2011); *see also J.N. v. District of Columbia*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010). "A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017). However, "while a certain amount of deference should be accorded to the knowledge and expertise of the Hearing Officer, particularly in regards to [his] credibility determinations, courts do not need to defer to a decision that lacks reasoned and specific findings." *McNeil v. District of Columbia*, 217 F. Supp. 3d 107, 114 (D.D.C. 2016) (internal citations omitted). When a hearing officer's determination lacks reasoned and specific findings, there is "an incomplete basis for review by the court in accordance with the IDEA," and remand is appropriate so that "reviewing courts [do] not substitute their assessment of the evidence for that of hearing officers." *Options Pub. Charter Sch. v. Howe ex rel. A.H.*, 512 F. Supp. 2d 55, 57 (D.D.C. 2007) (internal citation and quotation marks omitted).

First, Parents take issue with both Hearing Officers' failure to use the terms "cogent and responsive" when explaining H.R.'s proposed IEPs and placements. Pl. Mem. at 17. Although Parents correctly quote the Supreme Court's opinion in *Endrew*—that a court "may fairly expect [relevant] authorities to offer a *cogent and responsive* explanation for their decisions" about the IEP—nothing in that case mandated the Hearing Officers to use such language. *Endrew*, 137 S.

Ct. at 1000 (emphasis added).  Indeed, courts confronting this exact argument in IDEA cases

have recognized that: "the IDEA does not require that a Hearing Officer use those exact words[,

cogent and responsive,] when explaining his conclusions." *M.R. v. District of Columbia*, No. 21-

cv-02990, ECF No. 20, *report and recommendation adopted*, ECF No. 19 at 22 (Sept. 11, 2023).

Thus, the HODs were not deficient for their failure to use the words "cogent and responsive."

      Next, Parents argue that the Hearing Officers improperly found the DCPS witnesses

credible  in concluding that the IEPs were appropriate.  Specifically, Parents contend that the

Hearing Officers, in making their credibility assessments, did not consider DCPS's lack of

explanation for the hours of specialized instruction in the proposed IEPs.  *See* Pl. Mem. at 17.  In

support of this argument, Parents object to Hearing Officer Lazan's decision to credit the

testimony of DCPS witnesses over Parents' witnesses, because the DCPS witnesses had not

observed H.R. "in preparation for the development of his April 2020 IEP" and "simply had never

seen him in preparation for the April 2020 IEP meeting."  *Id.* at 17–18; Pl. Reply at 6.  Parents

specifically attack the credit given to witnesses Hughes, Barlow, Hawkins, Bradley, and Nolen,

as they "never observed [H.R.] at all;" witnesses Nguyen and Moise, as they only observed H.R.

in 2018; and witnesses Manuel and Nadir, as they observed H.R. after development of the April

2020 IEP.  *Id.*  Defendants counter that Hearing Officer Lazar "extensively explained the basis

for his decisions to credit DCPS's witnesses over [Parents']."  Def. Mem. at 29.

      Parents' focus on the lack of recent DCPS witness observations of H.R. has no bearing on

the credibility of the testimony considered by Hearing Officer Lazan or the weight afforded to

the testimony of each witness.  With respect to witnesses Nguyen and Moise, Hearing Officer

Lazan addressed this very credibility objection in the HOD, specifying that he credited the

testimony of these witnesses regarding their opinions on whether H.R. could manage the general

36

education setting for part of the school day because they were the *only* witnesses to ever observe H.R. in the general education setting, which necessarily was in the past because H.R. has remained in a special education setting at Lab since the 2018–19 school year. *See* AR1 28 ("None of Petitioners' school-based witnesses observed [H.R.] in a general education setting, which is the focus of this dispute.").

Otherwise, Parents challenge testimony that required no direct observation or knowledge of H.R. personally. Witnesses Barlow and Nguyen are credited for testimony regarding the purposes and uses of the Orton-Gillingham program generally, not with respect to H.R. specifically. *See* AR1 30. Nolen is only credited for her testimony regarding whether specific accommodations and goals in the IEP addressed executive functioning issues in general. *See* AR1 26. Nadir and Barlow are credited for their assessment of whether the proposed placement could implement the IEP. *See* AR1 29. Finally, Hearing Officer Lazan does not even specifically credit the testimony of remaining DCPS witnesses Hughes, Bradley, and Hawkins— three additional witnesses that the Parents take issue with. *See* Pl. Mem. at 18. Parents therefore offer no extrinsic evidence to contradict Hearing Officer Lazan's credibility determinations. *Wimbish*, 381 F. Supp. 3d at 29 n.5. Thus, Hearing Officer Lazan properly explained why he relied on DCPS witness testimony.

Hearing Officer Lazan also explained why the fifteen hours of proposed specialized education was appropriate. He cited testimony from DCPS witnesses Nguyen and Moise to support his conclusion that H.R. "interacted appropriately with peers," which led to a further conclusion that fifteen hours of specialized education outside the general education was appropriate. AR1 28. He also noted that DCPS witness Nolen "explained [fifteen hours] were enough specialized instructional hours to implement the IEP goals." *Id.* He further remarked

that "[n]one of Petitioners' school-based witnesses observed [H.R.] in a general education

setting." *Id.* He therefore afforded more weight to DCPS witnesses' testimony.

Parents also fault Hearing Officer Banks for affording too much deference to DCPS

witnesses and for "fail[ing] to reference the DCPS witnesses at all in the analysis of his decision"

and thus not providing "the analysis required of the Hearing Officer in assessing the weight

given to witnesses and their testimony." Pl. Mem. at 18. Parents draw comparison to *M.O. v.*

*District of Columbia*, 20 F. Supp. 3d 31 (D.D.C. 2013), where this Court remanded the Hearing

Officer's decision for lack of "sufficiently detailed reasoning," because the HOD did not address

the concerns raised by the parents' witnesses nor explain why the District's witnesses were

credited over the parents' witnesses. *See also Options*, 512 F. Supp. 2d at 57–58 (reversing and

remanding IDEA action for further administrative proceedings where the hearing officer made

"no findings with respect to the basis upon which she credited . . . testimony" and "elsewhere . . .

relie[d] upon speculation"). In response, Defendants list the testimony of DCPS witnesses

referenced in the findings of fact and note where Hearing Officer Banks acknowledged and

discounted the testimony of Parents' witnesses. *See* Def. Mem. at 28–29.

The District correctly notes that Hearing Officer Banks references DCPS witnesses'

testimony and findings several times in his findings of fact, and three times in the analysis of his

decision. First, he incorporates testimony of DCPS witnesses Regina Nadir and Nicole Manuel

regarding their first-hand classroom observations of H.R. AR2 at 27 (both testifying that the

student was mostly on-task during observations). Hearing Officer Banks then reasoned, in

considering this testimony, the relevant law, the IEP, and other evidence, that the IEP accounted

for H.R.'s needs and the proposed class environment was fine. *See id.* at 27–28. Although

Hearing Officer Banks does not explicitly explain why he afforded more weight to DCPS

witnesses on this topic, *id.* at 28, Parents offer no extrinsic evidence that suggests either Nadir or Manuel were not credible witnesses to their own first-hand observations of H.R. and should not have received deference from the hearing officer. *Wimbish*, 381 F. Supp. 3d at 29 n.5. Second, Hearing Officer Banks explicitly credits the testimony of the Assistant Principal and Special Education Manager of the placement proposed in the IEP, regarding the school's ability to implement the IEP. *See* AR2 at 28. Regarding the latter, Hearing Officer Banks provides a reason for finding more persuasive this testimony—that Parents' witnesses "offered no credible testimony to contradict" it. AR2 at 27.

Otherwise, Hearing Officer Banks "considered and methodically explained why he did not credit specific testimony, statement-by-statement and issue-by-issue." *B.B. v. District of Columbia*, No. 20-cv-02467, 2022 WL 834146, at *11 (D.D.C. March 21, 2022). For example, he notes that "relatively benign findings on Conners and BRIEF-2" tests suggest that attention and executive functioning did not have a significant effect on H.R.'s classroom performance "as was suggested by [Parents'] witnesses." AR2 26. Elsewhere, he finds the testimony of witness Courtney Heldman and H.R.'s mother predicting how H.R. would behave in a general education classroom "purely speculative," for neither had observed H.R. in that setting and their prediction was contrary to past observations of H.R. in the general education classroom. *Id.* at 27–28. Thus, he did "address the concerns raised by [Parents'] professionals." Pl. Mem. at 19 (citing *M.O.*, 20 F. Supp. 3d at 41). Regarding H.R.'s proper placement, Hearing Officer Banks concluded that DCPS witnesses testified that Murch could implement the IEP as proposed, and Plaintiff's witnesses did not provide any testimony to the contrary. *See* AR2 28.

Hearing Officer Banks could have been more thorough in his explanation, but his decision did not "lack[] reasoned and specific findings" that would warrant remand. *McNeil*, 217

F. Supp. 3d at 114.  Thus the undersigned recommends affirming both his and Hearing Officer's Lazan's determinations regarding the relative persuasiveness and credibility of witness testimony on the issues presented.

**B.  Substantive Challenges to IEPs**

The IDEA "requires the school district to create and implement an [individualized education program]" for children with disabilities who are eligible for special education services. *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006).  This IEP is "the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181); *see also Honig*, 484 U.S. at 311 (noting that Congress "[e]nvision[ed] the IEP as the centerpiece of the statute's education delivery system for disabled children"); 20 U.S.C. § 1414(d)(2)(A).  The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig*, 484 U.S. at 311.  The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 137 S. Ct. at 999.

The IEP also must comply with the IDEA's requirement that students "be educated in the least restrictive environment possible." *Leggett*, 793 F.3d at 74.  After the IEP is developed, the school district must provide the child with an appropriate educational placement that comports with the IEP.  *See* 34 C.F.R. § 300.116(b)(2); *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 99 (D.D.C. 2008).  If the child's appropriate educational placement is in the regular

classroom of a public education system, the IEP "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204.

### 1. Reading

Parents assert that H.R.'s IEPs are inappropriate for failing "to program for H.R.'s specific needs and specify the reading methodology[, the Orton-Gillingham program,] that has been so successful for him at Lab School." Pl. Mem. at 21. Parents further challenge the IEPs for failing "to specify how [H.R.'s] reading instruction will be provided at all." *Id.* at 23. The District responds that DCPS has the discretion to determine methodology and that, in any event, no such reading methodology needed to be provided. *See* Def. Mem. at 21–22.

Parents principally argue that the IEPs should have included the Orton-Gillingham method in the IEP because its implementation and H.R.'s small class sizes are the reason for his progress in reading at Lab School. *See* Pl. Mem. at 21. As an initial matter, Parents did not provide any evidence that H.R.'s progress was "due to the very small class sizes"—they support this assertion by simply noting that H.R.'s mother explained that H.R. previously required a 3:1 and 2:1 teaching setting but recently "graduated" to a 4:1 setting for reading, and by relying on other conclusory testimony. Pl. Mem. at 24. Parents dedicate most of their argument to the methodology issue, arguing that it was necessary for the IEPs to specify the Orton-Gillingham program. *See id.* at 22.

Regarding Parents' argument that H.R. needed small class sizes to progress in reading, Hearing Officer Lazan reasoned that the record did not contain any "clear and compelling evidence" that H.R. could not manage general education classes with accommodations. AR1 27. Notably, he cited to testimony in which witnesses said H.R. was on grade-level in reading, writing, and mathematics at the time of the April 2020 IEP meeting. *See id.* The Hearing

Officer openly admitted that the Orton-Gillingham methodology proved to be successful for H.R. when it was incorporated into his education. *See* AR1 29. But the issues identified with H.R.'s reading at the April 2020 IEP meeting differed from those that triggered the implementation of that program back in 2018 when he "was essentially not reading at all." AR1 29–31. The April 2020 IEP that was proposed by DCPS accounted for H.R.'s growth over the years since the Orton-Gillingham program was first introduced to him. *Id.* For example, the April 2020 IEP noted that H.R. had trouble "reading too quickly," but he "demonstrate[d] accurate blending and segmenting," and he reported an 80% or higher accuracy on tests evaluating his reading of words containing consonant blends, substituting initial and final sounds, and decoding single and multi-syllable real words. AR1 522. He was "[a]bove grade level" in reading. *Id.* The Hearing Officer thus reasonably concluded that it was justifiable for DCPS to not include the Orton-Gillingham program on H.R.'s IEP and instead include reading goals that accounted for his current needs. AR1 30–31 ("The [] question is whether the school district offered the Student a reasonably-calculated IEP in April, 2020[,] not whether [Lab] was appropriate for [H.R.].").

Parents did not appear to raise this issue—whether the IEP should have included the Orton-Gillingham program—in the administrative proceedings surrounding the April 2021 IEP. Nevertheless, the Parents raised alleged deficiencies with the 2021 IEP that related to H.R.'s reading deficits, so Hearing Officer Banks considered H.R.'s reading deficits generally.[5] Like Hearing Officer Lazan, Hearing Officer Banks acknowledged that H.R. struggled in reading in 2018, but his assessment summary issued in 2021 "revealed that by the fall of 2020, [H.R.] met

---

[5] DCPS argues that "both hearing officers correctly found that H.R.'s IEPs were appropriate despite not including Parents' desired Orton-Gillingham methodology," even though the Parents did not specifically argue that the Orton-Gillingham program was improperly excluded from the 2021 IEP and Hearing Officer Banks therefore did not explicitly address this issue in his HOD. Def. Mem. at 21.

grade-level expectations on all aspects of [four different reading assessments]," and H.R. was "able to read a grade-level passage independently with 100% comprehension." AR2 25. Hearing Officer Banks cited additional testing results and reports from the schools to ultimately conclude that H.R. "was at or near grade-level when the IEP team met in April 2021." *Id.* ("Student was Average on all Reading Subtests."). Hearing Officer Banks noted that H.R. now was presented with the challenge of "reading so fast that it impaired his comprehension in 2021"—a different reading challenge than not being able to read at all. AR2 26. Hearing Officer Banks noted "[t]here is . . . no record of extreme executive dysfunction" such that H.R. "requires a small class environment," effectively responding to Parents' argument that H.R. requires small class sizes to progress in reading. AR2 28. Hearing Officer Banks thus concluded that the proposed IEP, including the reading goals, was appropriate.

The out-of-Circuit cases Parents cite do not mandate that DCPS, the Hearing Officer, or this Court impose the Orton-Gillingham program in H.R.'s IEPs. The first case emphasized that an IEP does not have to "maximize" a student's educational potential. *See, e.g.*, *L.C. on behalf of A.S. v. Issaquah Sch. Dist.*, No. 17-cv-01365, 2019 WL 2023567, at *23 (W.D. Wash. May 8, 2019), *aff'd sub nom. Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048 (9th Cir. 2022) (finding the IEP appropriate even though it did not include the Orton-Gillingham program, against the plaintiffs' wishes, because "the IDEA does not require the District to design a program to maximize [child's] educational potential"). Another case confronted whether "the IEP team was required to include the Orton-Gillingham methodology, or a *similar program*, in [the child's] IEP." *Rogich v. Clark Cnty. Sch. Dist.*, No. 17-cv-01541, 2021 WL 4781515, at *6 (D. Nev. Oct. 12, 2021) (emphasis added). That case, not binding on this Court, found that the school committed procedural and substantive violations and erred in "[f]ailing to identify a

methodology," not the Orton-Gillingham methodology in particular, to account for the unique

needs of the student—a student who needed a consistent program to ensure progress.  *Id.* at *8.

The case also relied on a manual specific to the defendant school in Nevada that said, "in rare

circumstances, a student's individual needs may require a certain methodology if the IEP team

determines that it would be necessary for the student to receive FAPE."  *Id.*  Thus, this case did

not "confirm[] the importance of including the Orton-Gillingham methodology," under the IDEA

as Parents claim.  Pl. Mem. at 22.  Parents do not cite to any manuals that mandated that the

District specify a particular methodology, and any arguments that the Orton-Gillingham program

was "necessary" are appropriately discounted by the District and Hearing Officers for reasons

explained below.  *Id.* (citing Assistance to States for the Education of Children With Disabilities

and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 FR 12406,

12552 (OSERS March 12, 1999)).

To the contrary, DCPS generally maintains discretion in determining instructional

methodology and the IDEA does not require IEPs "to provide a specific program or employ a

specific methodology in educating a student."  *Greenwood v. Wissahickon Sch. Dist.*, 571 F.

Supp. 2d 654, 663 (E.D. Pa. 2008); *see also, e.g.*, *Allyson B. v. Montgomery Cty. Intermediate

Unit No. 23*, No. 07-cv-02798, 2010 WL 1255925, at *11 (E.D. Pa. Mar. 31, 2010) ("[T]here is

no requirement that the IEP include the curriculum.");  *Lopez v. District of Columbia*, 355 F.

Supp. 2d 392, 398 (D.D.C. 2005) ("It must be recalled that [the witness's] assertion that the

FAPE had to contain, for example, a specific reading program, does not mean that the IEP was

deficient because it did not.").  That is because "questions of methodology are for resolution by

the States."  *Rowley*, 458 U.S. at 208.  In that vein, this Court has held that "questions about the

methodology of instruction cannot be decided by a court."  *R.B. v. District of Columbia,* No. 18-

cv-00662, 2019 WL 4750410, at *13 (D.D.C. Sept. 30, 2019); *see also Fairfax Cty. Sch. Bd. v. Knight*, No. 05-cv-01472, 2006 WL 6209927, at *8 (E.D. Va. Aug. 23, 2006) ("[I]t is not the place of this Court to pass upon the relative merits of educational theories and methodologies."), *aff'd*, 261 F. App'x 606 (4th Cir. 2008).  Accordingly, courts "may not substitute [their] own notions for sound educational policy for those of school authorities."  *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 35–36 (D.D.C. 2013).  And parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student.  *See, e.g.*, *David G. v. Council Rock Sch. Dist.*, 2011 WL 7678685, at *3, *6 (E.D. Pa. Dec. 23, 2011), *report and recommendation adopted*, 2012 WL 1231812 (E.D. Pa. Apr. 12, 2012); *Lachman v. Illinois Bd. Of Educ.*, 852 F.2d 290, 297 (7th Cir.1988) ("Once it is shown that the Act's requirements have been met, questions of methodology are for resolution by the responsible authorities.").

Both Hearing Officers reasoned that the District did not propose including the Orton-Gillingham method primarily because of H.R.'s strong progress in reading since the implementation of the program and his ability to read on grade-level.  These conclusions are well reasoned and supported by the record.  For the 2020 IEP, DCPS witnesses Barlow and Nguyen testified that the Orton-Gillingham program is about "decoding," but H.R. no longer struggled with decoding at the time of the IEP meetings in 2020.[6]  *See* AR1 1562–63 (Barlow outlining concerns with specifying a methodology in an IEP, noting that H.R. was "reading at a fifth grade level," and opining that Orton-Gillingham was an "inappropriate methodology at this time

---

[6] Parents' argument in their Reply that points out that the program addressed other skills in addition to decoding still does not suffice because the Parents merely assert that he "continued to need [the program]," without explaining why H.R. would continue to benefit from the program considering his present reading abilities.  Pl. Reply at 8.

because [H.R.] has decoding skills clearly here [because] he is reading very quickly"); AR1 1468 (Nguyen opining that H.R. was "reading on grade level" and that the Orton-Gillingham method would not be appropriate based on his reading abilities and progress). Parents' witnesses did not contradict this testimony. For the 2021 IEP, DCPS witnesses testified that H.R.'s reading skills had improved since 2018, and the 2021 IEP was appropriate in light of H.R.'s progress. AR2 1193 (DCPS witness Nguyen testifying that "[i]n terms of his academic functioning, there was a huge improvement in terms of his overall reading skills" and "his oral reading skills . . . were significantly improved" compared to 2018).

Parents' argument that the IEPs did not adequately specify how H.R.'s reading instruction would be provided lacks merit, as the IEPs offered the requisite level of specificity. The April 2020 IEP details two reading goals and also provides for fifteen hours per week of specialized instruction in a "structured classroom setting with limited distractions, when being introduced to new skills." AR1 521–24, 530, 532. The Prior Written Notice ("PWN") for this IEP, issued on April 22, 2020 noted that:

> The MDT synthesized all available data sources to develop present levels of performance, goals, accommodations, and to identify appropriate classroom aides/support services. Based on the aforementioned, DCPS proposed 15 hours of specialized instruction outside of the general education setting and 240 minutes per month of Occupational Therapy services, also outside of the general education setting, with an additional 30 minutes per month of consultation.

AR1 543. Similarly, the IEP and PWN for April 2021 included the detail that is required. AR1 1102 (noting the specifications under which H.R. was to receive specialized instruction and occupational therapy); AR2 830–31 (PWN for April 2021 IEP).[7]

---

[7] Whether fifteen hours of proposed specialized instruction was appropriate is further addressed elsewhere in this Report and Recommendation. *See infra* Section I.B.3, Full-Time Special Education.

Parents do not point to cases in this District that have found that an IEP failed to provide for a FAPE by not including specifics about the child's program beyond the information provided by the District in this case.  The District was not required to include more detail on the IEP or PWN.  *See, e.g.*, *Jones v. District of Columbia*, No. 17-cv-01437, 2018 WL 7286022, at *12 (D.D.C. Sept. 5, 2018), *report and recommendation adopted*, 2019 WL 532671 (D.D.C. Feb. 11, 2019) ("[T]he IEP is required to include at least a brief description of the [least restrictive environment].");  20 U.S.C. § 1414(d)(1)(A)(i)(V) (an IEP must include "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc)").

The undersigned therefore finds that the Hearing Officers considered H.R.'s reading progress and deficits and reasonably concluded that the IEPs appropriately accounted for H.R.'s needs, and recommends that the Court affirm both HODs on this issue.

## 2. *Executive Functioning*

Parents argue that school officials "refused to propose specific goals and specialized instruction" in the area of executive functioning "[d]espite recognizing that H.R. has needs in the area."  Pl. Mem. at 24.  The District contends that H.R.'s executive functioning needs were addressed in multiple sections of the IEPs, and Parents cite no legal authority in support of their position.  *See* Def. Mem. at 23–24.

Parents contend that witness testimony and test results highlighted H.R.'s need for executive functioning supports due to his challenges with "hyperactivity and distractibility," his "needs with attention and organization," his "severe attentional control disorder," and his difficulties with "organization and controlling impulses," among others.  Pl. Mem. at 25–26. Hearing Officer Lazan articulated a sufficient factual basis for his finding that additional executive functioning goals were not necessary.  AR1 25.  He credited the testimony of several

47

witnesses who either (i) believed that other services on the IEP were designed to address executive functioning needs; (ii) thought executive functioning goals were not necessary, or (iii) believed that the IEP *did* include executive functioning goals via the inclusion of the "Motor Skills/Physical Development Goal[s]."  AR1 25-26.  The Hearing Officer noted that the accommodations section of the IEP addressed the Parents' concerns in this area.  *See* AR1 26 ("Witness J said that accommodations in the IEP relating to chunking, visual timers, checklists, alternative seating options, paper adjustments, and the like were designed to address executive functioning issues.").  He also reasoned that the occupational therapy services, the IEP's accommodations section, and the motor skills goals all addressed H.R.'s executive functioning issues.  *Id.* ("DCPS staff testified that they typically treat executive functioning as a 'cross-cutting' factor, rather than in a separate section of the IEP.").

Similarly, Hearing Officer Banks also agreed that the "Other Classroom Aids and Services" section of H.R.'s IEP addressed H.R.'s executive functioning deficits.  *See* AR2 26; Def. Mem. at 26.  Although Hearing Officer Banks found that "the objective record" does not support a finding that H.R.'s "executive functioning deficits are as extreme" as suggested by Parents' witnesses, he still found that there were services on the IEP to address such stated deficits.  AR2 26.  He also noted that Parents did not challenge the appropriateness of the OT goals and other classroom aides as a means to address the deficits.  *Id.*  He referenced H.R.'s Mother's responses on the BRIEF-2 test which placed H.R. "within normal limits on all three indices," and stated there was no evidence suggesting that H.R.'s performance is "significantly affected by inattention or executive functioning deficits."  *Id.*

Parents seem to take particular issue with categorizing the supports as accommodations rather than goals, but how to address the child's needs is up to DCPS, and this Court cannot,

absent a sound basis, disturb its recommendation.  Courts must give "'due weight' to the administrative proceeding and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education."  *Long v. District of Columbia*, 780 F. Supp. 2d 49, 59 (D.D.C. 2011); *see also J.N.*, 677 F. Supp. 2d at 322.  How DCPS sought to address the executive functioning supports within the IEP was its prerogative.

*Z.B.*, a case on which Hearing Officer Lazan relied in support of his determination, found that a child was not denied a FAPE for a lack of executive functioning *goals* when executive functioning *skills* were addressed in other areas of the child's IEP.  *Z.B.*, 888 F.3d at 527 ("The district court correctly concluded that the 2015 IEP did not deny [the child] an appropriate education for want of an executive functioning goal, because DCPS addressed executive functioning skills within the IEP's treatment of other areas of concern.").  In that case, the court found that the plaintiffs "have not demonstrated any respect in which the IEP's treatment of executive functioning goals denied [the child] an appropriate education."  *Id.*  Here, similarly, Parents have not argued why addressing executive functioning deficits in the IEP generally but not "propos[ing] specific goals" warrants a finding that the IEP is inadequate.  Pl. Mem. at 24.

Both IEPs here addressed H.R.'s executive functioning skills in other areas.  For example, both the 2020 and 2021 IEPs contained three goals addressing motor skills and physical development.  *See* AR1 526–29 (2020 IEP); AR2 524 (2021 IEP).  The first goal for the 2020 IEP addressed "functional neuromotor and motor planning skills to participate in school based tasks;" along similar lines, the 2021 IEP goal addressed "functional fine and visual perceptual motor skills."  AR1 526; AR2 525.  The second and third goals on the 2020 IEP addressed "functional visual perceptual motor skills" and "functional independence;" the 2021 IEP addressed "functional independence with participating in school based tasks" "with

adaptations/accommodations as needed" and "functional neuro/sensorimotor skills."  AR1 528;

AR2 526.  These goals were created to address H.R.'s behavior and attentiveness in the

classroom—the exact concerns raised by the Parents.

Both IEPs also included a long list of accommodations in the "Other Classroom Aids and

Services" section, which also addressed H.R.'s visual concerns and behavioral and attentive

concerns; preferential seating; instructional assistance; and several other concerns.  AR1 531;

AR2 528.  Together, the goals and accommodations addressed many, if not all, of the executive

functioning deficits specified by the Parents—H.R.'s challenges with hyperactivity,

distractibility, attention, organization, and controlling impulses.  *See* Pl. Mem. at 25–26.  Indeed,

the "other classroom aids and services" section on both IEPs explicitly noted such aides and

supports were "[t]o support [H.R.'s] executive functioning needs."  AR1 531 (April 2020 IEP);

AR1 1101 (April 2021 IEP).  It was therefore reasonable for both Hearing Officers to conclude

that executive functioning deficits were sufficiently addressed in both IEPs.

The undersigned concludes that the Hearing Officers did not disregard testimony that

H.R. had executive functioning deficits.  Although Hearing Officer Banks disagreed with the

alleged severity of H.R.'s executive functioning deficits, both Hearing Officers correctly found

that the IEPs included executive functioning supports.  Therefore, the undersigned recommends

affirming both HODs on this point.

### 3.  *Full-Time Special Education*

Parents argue that H.R. "requires full-time special education support" and that the

Hearing Officers erred in not finding fault with the IEPs for failing to require it.  Pl. Mem. at 28.

Parents cite H.R.'s "significant special needs that impact him across the entire school day" as a

basis for their argument.  *Id.*  The District argues broadly that the supports provided in the IEP

were sufficient based on H.R.'s needs.  *See generally* Def. Mem.

The IDEA requires that students "be educated in the least restrictive environment possible," which is one that "provides some educational benefit and most closely approximates the education a disabled child would receive if she had no disability." *Leggett*, 793 F.3d at 74. Specifically, the IDEA requires that:

> to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5). "DCPS defines any requirement of at least 20 hours per week of special education services to be a full time out of general education placement." D.C. Pub. Sch. Office of Specialized Instruction, Programs & Resources Guide for Staff 4 (2014) (defining "full-time" as requiring a "special education classroom for 20 or more hours of specialized instruction per week outside the general education classroom"); *Beckwith v. District of Columbia*, 208 F. Supp. 3d 34, 52 (D.D.C. 2016).

Hearing Officer Lazan concluded that full-time education was not necessary for several reasons. First, he stated that the evidence did not reflect that H.R. "requires 1:1 instruction or received 1:1 instruction at [Lab]." AR1 27. Nor did he find that there was "any clear and compelling evidence in the record that the Student could not manage some general education classes, with accommodations, at this point in his[] academic career." *Id.* He went on to note that "[t]here is nothing in the record to suggest that the Student's reading issues would prevent him from understanding instruction in general education classes," and his "executive functioning issues could be appropriately managed in the general education setting, particularly with the assistance of occupational therapy and a wide variety of pertinent accommodations." AR1 31.

Finally, Hearing Officer Lazan cited to a case in support of his position that the IEP was appropriate even though it may not necessarily offer "the best education that money can buy." AR1 32 (quoting *Z.B.*, 888 F.3d at 528).  As that court noted:

> If there is a gap between the best education that money can buy at a private school for a student with disabilities and the free and appropriate education at a public school that the IDEA promises, one might justly hope to close that gap for all students.  Meanwhile, what Congress has required is that public schools be ambitious for every child, giving each the opportunity to meet challenging objectives.

*Z.B.*, 888 F.3d at 528 (internal quotations and citations omitted).

Hearing Officer Banks similarly rejected Parents' argument that H.R. required full-time special education, finding a lack of evidence showing it was necessary.  He found that H.R.'s "perform[ance] on grade level for two years and his . . . recent evaluations do not support the contention that he needs intensive intervention in an academic cocoon to succeed."  AR2 28.  Furthermore, he found "no record of extreme executive dysfunction."  *Id.*  He admitted that "it is speculative as to how [H.R.] would fare in a large class, but nothing in his current behavior presages the harms predicted by [Parents'] witnesses."  AR2 27.  In addition, he noted that the IEP as proposed allowed "15 hours of specialized instruction outside of general education [, which] could be provided in a resource room."  AR2 28.  In sum, Hearing Officer Banks found that the IEP was appropriate and full-time education was not necessary.

*A.D. by next friends E.D. v. District of Columbia* is instructive to the undersigned's analysis.  No. 20-cv-02765, 2022 WL 683570 (D.D.C. Mar. 8, 2022).  In that case, the plaintiff challenged the HOD and argued that the student's IEP should have included full-time special education placement rather than the twenty hours of specialized instruction proposed by the

District.[8]  *Id.* at *6.  Four witnesses testified in support of this position.  *Id.*  The plaintiff's educational consultant testified that the child needed the full-time special education placement because of her executive functioning and anxiety; representatives from her private placement school testified that small class sizes were "key components" for her success; and her mother testified that she required such instruction based on her disabilities.  *Id.*  At no point, however, did the plaintiff offer evidence from an evaluation or other testing results that showed the child required full-time special education.  *Id.*  The court affirmed the HOD on this issue because the plaintiff's evidence was insufficient and because the HOD explained why the child could progress with only twenty hours of specialized education.  *Id.* at *9.

Another court in this District upheld a Hearing Officer's conclusion that an IEP was appropriate despite not granting full-time special education placement in *Hinson*, 579 F. Supp. 2d at 96.  There, the court found that full-time placement was inappropriate when the parent fully participated in the IEP decision-making process and there was a "lack of any expert evaluations or other evidence supporting full time special education."  *Id.*  The court found that an evaluation that said the student "may benefit from the use of personal instruction and smaller groups" was insufficient to show that the Hearing Officer erred in concluding that the IEP was appropriate.  *Id.*  In that case, the "only testimony on this issue was the parent's testimony."  *Id.*

The undersigned recommends that the Hearing Officer's decision be affirmed.  Similar to the evidence put forth in support of full-time placement in both *A.D.* and *Hinson*, here, Parents have failed to identify evaluations or studies providing concrete evidence that H.R. required full-time special education to progress.  Like the testimony put forth in *A.D.*, Parents' witnesses did

---

[8] The undersigned notes that "full-time" special education is defined as a "special education classroom for 20 or more hours of specialized instruction per week outside the general education classroom."  *Beckwith*, 208 F. Supp. 3d at 52.

not adequately explain why full-time placement was necessary as opposed to the proposed fifteen hours, particularly in the face of testimony from both sides that showed H.R. had already progressed significantly.

The testimony Parents cited in support of their position is conclusory and not based on concrete evidence, like an evaluation or testing.  For example, Parents' witness Taylor-Cunningham explained, in reference to the April 2020 IEP, that H.R. "requires specialized instruction all day" because in a larger setting "the pace is too quick" and there would be "too many transitions;" but she admitted she had not conducted any "formalized testing" of H.R. AR1 1370–71.  In relation to the April 2021 IEP, Taylor-Cunningham said that "it's so clear that [H.R.] requires small group wherever he is to organize himself, to attend, and to self-monitor." AR2 1602–03.  She continued that "[i]n a large class, my concern without having that support is that he will retreat, [and] will lose instruction. . . . He also requires a lot of movement, which in a larger setting would concern me."  AR2 1603.  Another Parents' witness, psychologist Dr. Rebecca Resnick, testified that H.R. needed full-time specialized care because he "has such complicated learning needs" and "is succeeding [at Lab] because of the features of that environment, that it's [a] small group, everything is intensely structured."  AR2 1548–49. Finally, H.R.'s mother testified that she "d[id]n't think [H.R. would] do well" if he was in the general education classes for more than half of his time.  AR2 1490.  She went on to say that she thought "he would either retreat or he would be so incredibly active that he would be probably a disturbance both to himself and the rest of the class."  *Id.*  All of this testimony is based on

conjecture based on the unsupported assumption that because H.R. had progressed in smaller class sizes, he could not progress in larger ones.[9]

In addition to the lack of evidentiary support for Parents' argument that H.R. required full-time special education, some of Parents' witnesses' rationales for full-time special education were already addressed in the IEPs.  For example, with respect to their argument that H.R. needed full-time special education to be taught in a "small group" setting with "intense[]" structure," AR2 1548–49, 1602–03 (Resnick and Taylor-Cunningham testimony), both IEPs accounted for "15 hours of specialized instruction outside of general education[, which] could be provided in a resource room" meeting those standards.  AR2 28; AR1 530 (2020 IEP proscribing fifteen hours of specialized instruction outside the general education setting); AR1 1100 (2021 IEP proscribing same).  Both IEPs included substantial executive functioning supports, such as "seating options that allow for subtle movement," which would address  Taylor-Cunningham's concerns that "he requires a lot of movement;" environmental and instructional supports, which would alleviate concerns that he would "retreat" or "probably be a disturbance" in the classroom; and transition supports, which would address "too many transitions" in the general education setting.  AR2 1602 (Taylor-Cunningham testimony); AR2 1490 (H.R.'s mother testimony); AR1 531 (2020 IEP listing under classroom aides and supports that H.R. requires "explicit

---

[9] DCPS witnesses also cautioned against educating a student in a restricted environment when the student is capable of learning and progressing in the general education setting.  *See, e.g.*, AR1 1591 (DCPS witness Barlow testifying that "the research shows the benefits of students being with their general education peers for both their general education peers and for those students with special needs as well in the greater literature about on special education. . . . we want[] to make sure we are following, you know, least restrictive environment and the benefits that come from having the education in the LRE").

instruction," "an environment with limited distractions, strategic seating, teacher," "prompting,"
"visual aides" and timers to support transitions); AR1 1102 (2021 IEP listing same).

For the preceding reasons, the undersigned finds that the fifteen hours of specialized
instruction outside the general education setting provided in both IEPs was appropriate because it
would "provide[] some educational benefit" and "closely approximate[]" H.R. with his peers
without disabilities. *Leggett*, 793 F.3d at 74. The undersigned therefore recommends that the
Court affirm the HODs on this issue.

### C. Challenges to Placements

Parents raise several issues regarding H.R.'s proposed placements—raising concerns
about their participation in the placement process and the Hearing Officers' consideration of
appropriateness of the proposed placement and H.R.'s transition to that placement. Each of
Parents' arguments related to the placement is addressed below in turn.

#### 1. Participation in Placement Process

Parents assert that their procedural right to participate in H.R.'s placement process was
violated. *See* Pl. Mem. at 33.[10] They contend that DCPS "failed to provide them with
information about H.R.'s proposed placement and programming at Murch" and they were denied
their "right" to allow their educational consultant to observe at Murch. *Id.* at 33–34. The
District sharply disagrees, arguing that the Parents not only participated in the IEP meetings, but
were also permitted to observe and object to the proposed location of services. *See* Def. Mem. at
30. The District also argues that the issue of parental participation was not properly raised in the

---

[10] Although Parents combine the discussion of this issue with the issue of whether Murch
was an appropriate placement in their brief, *see* Pl. Mem. at 33, the undersigned separates each
issue for clarity.

administrative hearings arising from the April 2021 IEP or adjudicated by Hearing Officer

Banks, and therefore not ripe for this court's review.  *See id.* at 31 n.4; Def. Reply at 8.

      The IDEA guarantees parents of children with disabilities the opportunity to participate in

the IEP process.  *See* 20 U.S.C. §§ 1414, 1415(b)(1).  Indeed, "[t]he core of the statute . . . is the

cooperative process that it establishes between parents and schools."  *Schaffer ex rel. Schaffer v.*

*Weast*, 546 U.S. 49, 53 (2005) (citing *Rowley*, 458 U.S. at 205–06).  The IDEA requires that

schools "take steps to ensure that one or both parents of a child with a disability are present at

each IEP Team meeting or are afforded the opportunity to participate."  34 C.F.R. § 300.322(a).

Parents' participation is essential for ensuring that their child's IEP reflects the "concerns of the

parents for enhancing the education of their child."  *Id.* § 300.324(a)(1)(i).  Parents must show

that the procedural violations "significantly impeded" the right to participate in order to show a

FAPE denial.  20 U.S.C. § 1415(f)(3)(E)(ii).

      Concerning the April 2020 IEP and placement, Hearing Officer Lazan noted in his

findings of fact that the April 2020 IEP "meeting was attended by Petitioners" and outlined the

specific disagreements between the Parents' proposed IEP and DCPS's proposed IEP.  AR1 17.

He further described the specific "details about the proposed placement," Pl. Mem. at 34, such as

the hours of specialized instruction and the goals and related areas of concern.  AR1 17–18.

Regarding Parents' claim that they were unable to "get[] information from DCPS about [Murch]

. . . during an observation" and did not receive a response to email questions, the Hearing Officer

noted that he was unaware of any authority that "specifically requires DCPS to answer questions

from a parent during an observation."  AR1 34.  He was also unaware of any authority that found

a FAPE denial based on an email non-response from DCPS or because parents were not allowed

to ask questions during observation.  *Id.*

This case is distinguishable from cases that have found procedural violations because the parents' rights to attend an IEP meeting were thwarted. *See, e.g.*, *B.D. by & through Davis v. District of Columbia*, No. 15-cv-01139, 2021 WL 6049879, at *8 (D.D.C. Dec. 21, 2021) ("[T]he complete exclusion of the [parents] from the IEP meeting rises to the level of a substantive FAPE denial because it 'significantly impeded' their ability to participate in B.D.'s educational planning."). Here, there is uncontested evidence that the Parents participated in the 2020 IEP meeting, so their participation rights were not violated on that basis. AR1 17, 515–542 (noting Parents' participation in April 2020 IEP meeting).[11] Thus, the IDEA's requirement that schools "take steps to ensure that one or both parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate" is satisfied. 34 C.F.R. § 300.322(a).

But the Parents do not stop there. They contend that they were denied *meaningful* participation in the placement process and were denied access to critical information about H.R.'s proposed placement in 2020. First, with regards to Parents' observation of DCPS's proposed public school placement and related correspondence and questions about the proposed placement, Parents admit they were able to observe at Murch in 2019 but not April 2020 due to the "height of the COVID-19 pandemic." Pl. Mem. at 36 n.5; AR1 1235 (testimony affirming that Parents and Taylor-Cunningham visited Murch in 2019). Instead, in the summer of 2020, they corresponded via email with Murch. Parents were displeased with DCPS's response— specifically the school's inability to share what distance learning would look like for 2020 and the absence of other information about H.R.'s programming. Pl. Mem. at 36; AR1 559–562.

---

[11] Although not relevant to this analysis, there is also uncontroverted evidence that the Parents participated in the 2021 IEP meeting. *See* AR2 17, 500–02.

But the email correspondence Parents point to appears to promptly respond to the questions asked. *See, e.g.*, AR1 559 ("Being that the virtual learning program is largely new the district our staff are working to finalize their individual plans based on district guidance."); AR1 559–561 (explaining the different curriculum programs the school uses for reading, math, etc.). Parents further allege that they were permitted to observe a second grade classroom at Murch in 2019, "despite H.R. being a fourth grader" and were told they could not ask any questions. Pl. Mem. at 36; *but see* AR1 1236 (H.R.'s mother testifying that H.R. was in third grade at the time of their 2019 Murch observation visit).[12]

However, Parents do not argue how the school's accommodation of their questions and observations denied H.R. a FAPE and robbed them of their ability to participation in the IEP process. Further, Parents do not point to any case law that suggests the District's actions rise to the level of a FAPE denial, and the undersigned can find none. Even the D.C. Code section that Plaintiff cites does not require a school to answer every question a parent may raise—it merely requires the school to afford a reasonable opportunity for the parent to observe the proposed placement. *See* D.C. Code § 38-2571.03(5)(B). Parents have not shown that this alleged procedural violation "significantly impeded" their right to participate in the IEP process. 20 U.S.C. § 1415(f)(3)(E)(ii).

Regarding whether Parents were denied meaningful participation in the placement process related to the April 2021 IEP, the undersigned must first consider whether this issue is appropriate for this Court's review. "A court has no subject matter jurisdiction over an IDEA claim that has not first been pursued through administrative channels." *Douglass v. District of*

---

[12] For reasons explained in subsequent paragraphs, the Parents' argument that "their educational consultant was denied th[e] opportunity" to visit Murch in 2021 is not considered in the Court's analysis of this issue. Pl. Mem. at 37.

*Columbia*, 750 F. Supp. 2d 54, 60 (D.D.C. 2010) (quoting *Massey v. District of Columbia*, 400

F. Supp. 2d 66, 70 (D.D.C. 2005)).  Complainants must file a due process complaint before

challenging the school district's actions under the IDEA in federal court and cannot raise a new

claim or issue in their civil complaint that was not previously raised in their due process

complaint.  *See B.D.*, 2020 WL 5763608, at *4.  The exhaustion requirement may be bypassed

only when the administrative remedies would be futile or inadequate.  *See Honig*, 484 U.S. at

327.  "In this Circuit, the exceptions for futility and inadequacy are narrowly construed, as the

exhaustion requirement may be waived only in the most exceptional circumstances." *Douglass*,

750 F. Supp. 2d at 61 (internal quotations omitted).  Complainants bear the burden of claiming

an exception.  *Id.*  In considering whether a claim was raised at the administrative stages, courts

may also look to the facts section of the due process complaint as well as the findings of fact and

analysis of the Hearing Officer's determination.  *See Oakes v. Thurgood Marshall Acad. Pub.*

*Charter High Sch.*, No. 20-cv-02754, 2022 WL 1556382, at *5 (D.D.C. May 17, 2022); *Thomas*

*v. District of Columbia*, 773 F. Supp. 2d 15, 18 (D.D.C. 2011).

 Because DCPS's due process complaint brought the April 2021 IEP before this Court, the

undersigned cannot rely on that complaint to determine whether this issue was properly raised by

Parents.  Rather, the undersigned will look to challenges made in Parents' response, which were

considered by Hearing Officer Banks and have already been addressed herein, and Hearing

Officer Banks' determination and prehearing order.  In Parents' response to the due process

complaint, *see* AR2 67–74, they do not raise any deficiencies with Parents' participation in the

April 2021 IEP and placement process.  Nor do the Hearing Officer's pre-hearing order or final

determination suggest this issue was raised.  *See, e.g.*, AR2 174 (listing issues and defenses), 16–

17 (discussing April 2021 IEP meeting generally).

Parents' only argument that this issue was raised in the administrative proceedings—that the Hearing Officer "clearly permitted testimony" related to this claim—is not persuasive.  Pl. Reply at 13.  The testimony they cite in support of this position was not "clearly" related to this claim; rather, it involved discussions of observations and other questions about Murch in the context of whether Murch was an appropriate placement.  For example, Parents' witness Taylor-Cunningham's testimony discusses "inappropriate placement," as explicitly characterized by the Hearing Officer, *see* AR2 1607–09, and H.R.'s mother's testimony again related to placement concerns, *see* AR1 1486–88.  Thus a review of the record before the Hearing Officer and the HOD suggests that this argument was not raised by Parents.  *Pinto v. District of Columbia*, 69 F. Supp. 3d 275, 287 (D.D.C. 2014) ("The undersigned, upon a searching review of that administrative due process complaint notice, finds that Plaintiffs made no reference whatsoever to [this issue]; additionally, a searching review of the Hearing Officer Determination reflects no consideration or determination by the Hearing Officer of [this issue].").

The undersigned does not find that exceptions to the exhaustion requirement apply in this instance, and Parents have offered none.  The undersigned therefore recommends that the Court decline to reach merits of Parents' participation claim as it relates to the April 2021 IEP and Hearing Officer Banks' determination.  Regarding the April 2020 IEP, for the aforementioned reasons, the undersigned finds that Parents were afforded an opportunity to participate in the IEP process and recommends that the Court affirm Hearing Office Lazan's decision on this issue.

### 2.   *Substantive Challenge to Placement*

Parents assert that Murch was inappropriate and the Hearing Officers "just dismissed the concerns about the proposed placement" raised by Parents' witnesses.  Pl. Mem. at 39.  Parents argued that Murch could not implement classes in a "small and structured setting" like Lab School and did not account for H.R.'s needs.  *Id.*  The District contends that there was

"undisputed evidence in both hearings" that established Murch's ability to implement the IEP. Def. Mem. at 32.

Hearing Officer Lazan found that Murch could implement the IEP, in light of DCPS witness testimony confirming that the school was capable of doing so. *See* AR1 33. He noted that Parents did not argue that Murch was unable to implement the IEP and dismissed the claim. *Id.* Hearing Officer Banks similarly acknowledged testimony from DCPS witnesses who confirmed Murch could implement H.R.'s 2021 IEP. *See* AR2 19.

After the IEP is developed, the school district must provide the child with an appropriate educational placement that comports with the IEP. *See* 34 C.F.R. § 300.116(b)(2); *Hinson*, 579 F. Supp. 2d at 99. If the child's appropriate educational placement is in the regular classroom of a public education system, the IEP "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. The school offered for placement must be able to "fulfill the requirements set forth in the student's IEP" and "provide personalized instruction with sufficient support services." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 143 (D.D.C. 2018) (internal quotation marks omitted). "A school district need only demonstrate that the student's placement was appropriate; a placement need not satisfy a parent's every desire and need not represent the best possible programming for the student." *Kerkam I*, 862 F.2d at 886. "DCPS bears the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the . . . proposed placement is adequate to meet the education needs of the student." D.C. Mun. Reg. § 3022.16; *Gellert v. D.C. Pub. Sch.*, 435 F. Supp. 2d 18, 22 (D.D.C. 2006). "So long as the location of services is based on and capable of implementing the student's IEP, local educational agencies generally have discretion in selecting the appropriate site." *B.D.*, 2021 WL 6049879, at *9.

Parents cite *Gellert* to support their argument that Murch is inappropriate.  *See* Pl. Mem. at 39.  In *Gellert*, there were documented instances of the child having anxiety in school "due to the noise and crowds" or in "large settings of 50 students."  435 F. Supp. 2d at 23.  Evidence also showed that the child's academic performance "improved significantly" in a "small class size and controlled environment."  *Id.*  In that case, only one witness testified on behalf of the District, who had not even seen the child's IEP "until that morning."  *Id.* at 24.  Thus there was overwhelming evidence that the child needed a smaller class size.  Here, Parents lack such evidence regarding H.R.'s alleged need for a smaller environment.  *See supra* Section II.B.3. (discussing Parents' evidence regarding need for small classes).

Turning to the other concerns Parents identified regarding the placement, such as H.R.'s alleged difficulty transitioning and the fast-paced environment of Murch, both IEPs included several classroom aides and accommodations to address these specific concerns.  *See, e.g.*, AR1 531 (April 2020 IEP listing under classroom aides and supports that H.R. requires "explicit instruction," "an environment with limited distractions, strategic seating, teacher proximity," "prompting," "visual aides" and timers to support transitions); AR2 1101 (April 2021 IEP listing the same).  These concerns seem to stem from the IEP itself, not necessarily the placement.  The inquiry for school placement is whether the school can implement the IEP, not whether the school satisfies the Parents' wishes.  *See Kerkam I*, 862 F.2d at 886.  Parents' conclusory assertions that Murch was inappropriate—without citing evidence contradicting DCPS witnesses' testimony proving Murch could implement the IEP—do not constitute a FAPE denial.  *See e.g.*, AR1 1371 (Parents' witness Taylor-Cunningham stating that Murch "is not appropriate" for H.R. without providing clear reasoning); *see also B.D.*, 2021 WL 6049879, at *10

("Ultimately, plaintiffs express a disagreement with the IEP team's conclusion that [Murch] was an appropriate placement, but this is insufficient to show a denial of a FAPE on this issue.").

Thus, the undersigned finds that Murch could implement the 2020 and 2021 proposed IEPs and recommends affirming the HODs on this issue.

### 3.   Consideration of Effect of Transition

Parents separately fault both Hearing Officers for failing to "consider[] the probable harmful effects of moving H.R. out of Lab School," to the proposed placement at Murch.  Pl. Mem. at 40.  Parents specifically allege that Hearing Officer Lazan ignored concerns that H.R. would have difficulty learning in virtual instruction, which was the only option in DCPS schools during the 2020–21 school year.  *Id.* at 41.  And they claim that Hearing Officer Banks ignored testimony that H.R. struggles with transitions and the fact that attending DCPS in the 2021–22 school year would have meant attending "three different schools over three different school years: Lab, Murch, and then a new school for middle school."  *Id.* at 42.  The District argues that neither issue was exhausted in the administrative proceedings.  *See* Def. Mem. at 33–34.

 "[M]atters not presented in a due process hearing are not administratively exhausted for the purposes of district-court review."  *Adams v. District of Columbia*, 285 F. Supp. 3d 381, 394 (D.D.C. 2018).  Under the IDEA, complainants are prohibited from "rais[ing] issues at the due process hearing that were not raised," in the due process complaint, "unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B); *see Damarcus S.*, 190 F. Supp. 3d at 55.  In considering whether an issue was raised at the due process hearing at all, courts may look to findings of fact and analysis of the Hearing Officer's Determination.  *See Oakes*, 2022 WL 1556382, at *5.

Parents' August 2020 Complaint did not allege or include facts that suggest virtual instruction at DCPS would harmful, or in some way render Murch an inappropriate placement.

Parents' complaint simply acknowledged that H.R. was receiving virtual instruction at Lab due to the pandemic, nothing more.  *See* AR1 50.  In fact, Parents may not have even been able to make such a claim when the due process complaint was filed in August 2020 as most school districts were transitioning in and out of virtual instruction to combat the COVID-19 pandemic, and therefore it was not clear at the time of the complaint whether the proposed placement would operate virtually for the entire school year.  Moreover, virtual instruction was not mentioned at all in the prehearing order and was referenced only in passing in Hearing Officer Lazan's findings of fact.  *See* AR1 90 (prehearing order); AR1 16 (noting that distance learning was a challenge for H.R. at Lab in 2020).

Parents point out that Hearing Officer Lazan permitted testimony from Parents that virtual instruction at Lab was challenging for H.R. and that "all virtual" instruction would not be appropriate.  *See* AR2 1228, 1241–42.  However, such "a cursory reference" to the fact that H.R. struggled with virtual instruction and that DCPS only offered virtual instruction "does not amount to an actual allegation of a violation of the IDEA."  *J.T. v. District of Columbia*, No. 21-cv-03002, 2023 WL 8369938 (D.D.C. Dec. 4, 2023).  Even if Parents had made a clear allegation here, DCPS counsel explicitly objected to the discussion of virtual instruction, *see* AR2 1240, and so virtual instruction would not qualify as an issue subject to the agreement exception in the statute.  *See* 20 U.S.C. § 1415(f)(3)(B).  Moreover, this testimony did not figure in any of Hearing Officer Lazan's analysis in his determination.  In sum, the issue of virtual instruction was not presented in the due process hearing and was therefore not properly exhausted for purposes of review.  *See Adams*, 285 F. Supp. 3d at 394 (finding that an issue arising after the complaint was filed and merely discussed during the hearing was not properly

exhausted).  The undersigned recommends that the Court decline to address Parents' virtual instruction claim regarding H.R.'s 2020–21 proposed placement.

Turning to Parents' concerns about H.R.'s transition relating to the April 2021 placement, Parents did not file a due process complaint, so this issue need not be held to the same exhaustion standard.  Notably, Parents' response did not explicitly argue that H.R.'s *transition* to 15 hours of specialized instruction constituted a denial of a FAPE.  *See* AR2 67–74.  But Parents' witness Taylor-Cunningham did testify that "just to move [H.R.] for 1 year and then cut support in half does not make sense" given his "transition challenges," and such a transition from "full time to half time [specialized instruction], . . . would be a disaster for H.R."  AR2 1607. And Hearing Officer Banks addressed this issue in his determination, albeit indirectly, by stating that "it is speculative to suggest that… such a change in [his] environment would be a 'disaster.'"  AR2 27.  The undersigned therefore finds that this issue is properly raised but concludes that Parents have not established that Hearing Officer Banks impermissibly failed to consider the effect of transitioning on H.R., for he clearly weighed the relevant testimony and dismissed the issue as speculative.

Even if Hearing Officer Banks' consideration of the issue was lacking, however, Parents present no compelling precedent that a Hearing Officer or the reviewing court must consider the effect of transition when assessing the proposed IEP and placement.  The cases cited by Parents are inapposite.  First, Parents point to *Holmes v. District of Columbia*, in which the court prohibited the mid-year transfer of a student in his last year of high school to a school that "could [not] have come even close to meeting [his] needs" where the record was "replete" with testimony that the student "will be harmed if he is transferred at any time."  680 F. Supp. 40, 42– 43 (D.D.C. 1988) (emphasis in original).  As emphasized by the District, H.R. was not at risk of

being transferred mid-year, *see* Def. Mem. at 34, and as noted here, Parents offered minimal testimony on the issue.  Moreover, Hearing Officer Banks had found that the IEP and placement were appropriate.  Second, Parents point to *Leggett and K.E. v. District of Columbia*, which again concerned a students' mid-year transition, where the Circuit Court prompted the court on remand to consider whether the students' transfer to a DCPS school "would have unduly disrupted [her] education" because the court had not yet addressed whether the proposed IEP and placement were appropriate.  793 F.3d at 74.  Neither case conclusively establishes that a Hearing Officer must consider the effect of a student's transition to an appropriate placement, and Parents have not shown that such a transition would violate H.R.'s right to a FAPE or an appropriate placement.  For these reasons, the undersigned recommends that the Court decline to address Parents' transition argument regarding the April 2020 and April 2021 placements.

### III.    Funding for H.R.'s Placement at Lab School.

Parents argue that they are entitled to prospective placement at Lab and continuing tuition reimbursement because "the record supports a finding" that DCPS did not provide a FAPE to H.R.  *See* Pl. Mem. at 43.  Because of this, Parents contend, case law dictates that their "request for placement should be granted."  *Id.* at 45.  The District asserts that the Court need not entertain this issue, "because H.R. was not denied a FAPE."  Def. Mem. at 34.

"If there is no public school which is suitable to be the educational placement of a child with an individualized education program, under IDEA, the school district must pay the cost of sending the child to an appropriate private school."  67B Am. Jur. 2d Schools § 381; *see also Z.B. by & through Sanchez v. District of Columbia*, 382 F. Supp. 3d 32, 37 (D.D.C. 2019), *aff'd sub nom. Sanchez v. District of Columbia*, 815 F. App'x 559 (D.C. Cir. 2020).  Tuition reimbursement is appropriate for "parents who place children in private school rather than accept

a deficient public school IEP." *Reid*, 401 F.3d at 522. "Parents may receive tuition reimbursement if the Court finds that (1) the public placement violated the IDEA, and (2) the private school placement was proper under the Act." *Anderson v. District of Columbia*, 606 F. Supp. 2d 86, 90 (D.D.C. 2009). If the public school placement was appropriate, the parents are not entitled to reimbursement, and the second factor need not be addressed. *Id.* "The appropriateness of the public school placement turns on two further sub-issues: (1) whether DCPS complied with [the] IDEA's procedural requirements, and (2) whether the IEP was reasonably calculated to provide some educational benefit to [the child]." *Id.* If "DCPS has made available a free appropriate public education to [the] child, . . . DCPS cannot be required to pay for the education [her] parents would prefer." *Id.* at 93.

The Hearing Officers did not award tuition reimbursement as they both found that the IEPs and related placement did not deny H.R. a FAPE. The cases Parents cite in support of their position do *not* mandate that the Court find parental placement appropriate when the public school has offered an appropriate IEP that is reasonably calculated to benefit the student. Pl. Mem. at 44–45 (citing *Carter v. Florence County Sc. District Four*, 950 F.2d 156, 163 (4th Cir. 1984)). And arguing that the "parents' request for placement should be granted" because "the evidence at the hearing was overwhelming that H.R. has been successful in his placement at Lab" misses the mark—it is not about whether H.R. succeeded at Lab but whether DCPS offered him a FAPE at the public school. Pl. Mem. at 45.

In light of the foregoing analysis, which addressed Parents' concerns with the IEPs proposed for H.R. for the 2020-2021 and 2021-2022 school years, the undersigned finds that the Hearing Officers were correct in their findings regarding the appropriateness of the IEPs. Because the undersigned finds that DCPS provided H.R. a FAPE—via an appropriate IEP and

corresponding placement for 2020 and 2021—the undersigned recommends that the Court affirm the Hearing Officers' decision that Parents are not entitled to tuition reimbursement for private placement at Lab.  *Pinto v. District of Columbia*, 69 F. Supp. 3d 275, 285 (D.D.C. 2014) (internal quotations omitted) ("[P]arents are not entitled to tuition reimbursement where the educational program and site proposed by DCPS comply with IDEA's FAPE requirement.").

## RECOMMENDATION

For the preceding reasons, the undersigned recommends that this Court DENY Parents' Motion for Summary Judgment, ECF No. 21, and GRANT the District's Cross-Motion for Summary Judgment, ECF No. 26.

## REVIEW BY THE DISTRICT COURT

The parties are advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection with the Clerk of this Court within fourteen days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objection.  The parties are further advised the failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date: March 29, 2024

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE